IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 99-11294

———————————————

IN THE MATTER OF: GWI PCS 1 INC;
GWI PCS 2 INC; GWI PCS 3 INC;
GWI PCS 4 INC; GWI PCS 5 INC;
GWI PCS 6 INC; GWI PCS 7 INC;
GWI PCS 8 INC; GWI PCS 9 INC;
GWI PCS 10 INC; GWI PCS 11 INC;
GWI PCS 12 INC; GWI PCS 13 INC;
GWI PCS 14 INC; GENERAL WIRELESS INC;
GWI PCS INC,

                                                      Debtors,

        versus

UNITED STATES OF AMERICA, on behalf of
FEDERAL COMMUNICATIONS COMMISSION,

                                                      Appellant,

        versus

IN THE MATTER OF: GWI PCS 1 INC;
GWI PCS 2 INC; GWI PCS 3 INC;
GWI PCS 4 INC; GWI PCS 5 INC;
GWI PCS 6 INC; GWI PCS 7 INC;
GWI PCS 8 INC; GWI PCS 9 INC;
GWI PCS 10 INC; GWI PCS 11 INC;
GWI PCS 12 INC; GWI PCS 13 INC;
GWI PCS 14 INC; GENERAL WIRELESS INC;
GWI PCS INC,

                                                      Appellees.

———————————————
Appeal from the United States District Court
for the Northern District of Texas
———————————————

October 20, 2000

Before GARWOOD, WIENER, and DeMOSS, Circuit Judges.
GARWOOD, Circuit Judge:

        The Federal Communications Commission (FCC), on behalf of the

United States, appeals from the district court's judgment affirming a

bankruptcy reorganization plan for debtors General Wireless, Inc. (GWI), GWI PCS, Inc. (GWI PCS), and GWI PCS 1, GWI PCS 2, GWI PCS 3, GWI PCS 4, GWI PCS 5, GWI PCS 6, GWI PCS 7, GWI PCS 8, GWI PCS 9, GWI PCS 10, GWI PCS 11, GWI PCS 12, GWI PCS 13, GWI PCS 14 (the subsidiary debtors), (collectively, the Debtors).  The reorganization plan included an order that the subsidiary debtor's and GWI PCS's obligation to pay $954 million to the FCC, evidenced by promissory notes signed by the subsidiary debtors, as part of GWI PCS's winning bids for fourteen radio-spectrum licenses at an FCC auction, was a constructive fraudulent transfer under 11 U.S.C. § 548.  The bankruptcy court therefore avoided approximately $894 million of the $954 obligation to the FCC and allowed the subsidiary debtors to retain the licenses.  The FCC now appeals the avoidance judgment, arguing that its appeal of the avoidance judgment is not equitably moot and that the bankruptcy court improperly assumed the FCC's regulatory authority and erred in avoiding $894 million of the obligation to the FCC.  We affirm.

**Facts and Proceedings Below**

In 1993, Congress passed several amendments to the Federal Communications Act (FCA), including section 309(j). *See* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 6002(a), 107 Stat. 312, 387 (1993).  Section 309(j) authorized the FCC to sell electromagnetic licenses for personal communications services (PCS) to private companies by auction.  Section 309(j) also required the FCC to design auctions that "ensure that small businesses, rural telephone

2

companies, and businesses owned by members of minority groups and women are given the opportunity to participate in the provision of spectrum-based services." 47 U.S.C. § 309(j)(4)(D); *see* 47 U.S.C. § 309(j)(3)(B). To further this directive, the FCC reserved the C and F-blocks of the electromagnetic spectrum[1] for auction to small, entrepreneurial companies referred to as "designated entities." *See* 47 C.F.R. § 24.709 (1995).

The C-block auction began in December 1995 and ended on May 6, 1996. On December 18, 1995, GWI made the initial payment of approximately $53 million to qualify GWI PCS, a subsidiary of GWI, to bid at the C-block auction.[2] At the conclusion of the C-block auction, GWI PCS was the high bidder for fourteen PCS licenses, covering areas in Southern Florida, Northern California, and Atlanta, Georgia. *See In re Applications of GWI PCS, Inc.*, 12 F.C.C.R. 6441 ¶ 2, 1997 WL 159931

---

[1] The megahertz of radio frequency determines the carrying capacity of a block of wireless spectrum, and the FCC had divided the electromagnetic spectrum allocated to PCS licenses into "blocks" designated as the A, B, C, D, E, and F-blocks. The A, B, and C-blocks consist of 30 megahertz of spectrum, while the D, E, and F-blocks of 10. Another measurement, a "pop", represents 1000 persons within the geographic area covered by a particular licensing block. Dollars per megahertz-pop, a generally accepted industry measurement standard, represents the amount paid for a license that would allow the provision of a particular level of communications data to a particular number of people.

[2] As part of the FCC's C-block auction rules, bidders were required to deposit "qualifying amounts" in order to participate in the auction. *See* 47 C.F.R. § 24.711(a)(1) (1995) ("Each eligible bidder for licenses on frequency Block C subject to auction shall pay an upfront payment of $0.015 per MHz per pop for the maximum number of licenses (in terms of MHz-pops) on which it intends to bid pursuant to § 1.2106 of this chapter and procedures specified by Public Notice.").

3

(Jan. 27, 1997). GWI PCS's winning bids were each approximately five percent higher than the next-highest bid and totaled approximately $1.06 billion.[3] On May 22, 1996, GWI PCS filed license application forms for the fourteen licenses. *See* 47 C.F.R. § 24.707 (1995)[4]. On May 31, 1996, the FCC released a public notice accepting GWI PCS's applications for the licenses and setting July 1, 1996 as the cut-off date for parties in interest to file objections, pursuant to 47 C.F.R. § 24.830 (1995), to GWI PCS receiving the licenses. *See In re Applications of GWI PCS, Inc.*, 12 F.C.C.R. 6441 ¶ 2, 1997 WL 159931 (Jan. 27, 1997). Two parties did object, contending that GWI PCS had violated the foreign ownership restrictions, *see* 47 U.S.C. § 310(b), 47 C.F.R. § 24.804(b) (1995), and the rules against collusive bidding, *see* 47 C.F.R. § 1.2105(c) (1995)[5]. *See In re Applications of GWI PCS, Inc.*, 12 F.C.C.R.

---

[3] The C-block auction resulted in the awarding of 493 C-block licenses to approximately 90 designated entities for a total bid amount of approximately $10.2 billion.

[4] 47 C.F.R. § 24.707 states as follows:
"Each winning bidder will be required to submit a long-form application on FCC Form 600, as modified, within ten (10) business days after being notified that it is the winning bidder. Applications on FCC Form 600 shall be submitted pursuant to the procedures set forth in Subpart I of this Part and § 1.2107 (c) and (d) of this Chapter and any associated Public Notices. Only auction winners (and applicants seeking partitioned licenses pursuant to agreements with auction winners under § 24.714) will be eligible to file applications on FCC Form 600 for initial broadband PCS licenses in the event of mutual exclusivity between applicants filing Form 175. Winning bidders need not complete Schedule B to Form 600."

[5] 47 C.F.R. § 24.701 provides that the competitive bidding procedures for broadband PCS incorporate "[t]he general competitive

6441 ¶ 4, 1997 WL 159931 (Jan. 27, 1997). After investigating the bases for the objections, the FCC concluded that GWI PCS did not exceed the foreign ownership limitations and that there was insufficient evidence to find that GWI PCS had violated the FCC's rules prohibiting collusion in the bidding process. *See id*. ¶ 5.

On January 27, 1997, the FCC approved the granting of the fourteen licenses for which GWI PCS was the high bidder. *See Wireless Telecommunications Bureau Announces Grant of Broadband Personal Communications Services Entrepreneurs' C Block Licenses to GWI PCS Inc.*, 12 F.C.C.R. 1215, 1997 WL 28957 (Jan. 27, 1997). At GWI's request, each license was conditionally transferred to one of the fourteen subsidiary debtors.[6] *See id*. at n.1. On February 3, 1997, GWI paid the second half of the down-payment, $53 million, for the licenses on behalf of the subsidiary debtors. On March 10, 1997, the fourteen subsidiary debtors executed notes to the FCC for amounts totaling approximately $954 million–the sum of the winning bids for the fourteen licenses less the ten percent in down-payments made by GWI. The notes were sent to the

---

bidding procedures found in 47 CFR Part 1, Subpart Q . . . unless otherwise provided in [47 C.F.R. Part 24, Subpart H]."

[6] Pursuant to the FCC regulations issued under 47 U.S.C. § 309(j), winning bidders that were "small businesses" were required to pay only 10 percent of their winning bids in cash; the remaining 90 percent could be paid in installments over a ten-year period at below market interest rates. *See* 47 C.F.R. §§ 1.2110(e), 24.711(b) (1995). The transfer of the licenses remained contingent on the subsidiary debtors signing the notes and the depositing of the remaining 5 percent of the down-payment; however, upon the execution of the notes on March 10, 1997, the licenses became effective as of January 27, 1997.

FCC by Federal Express on March 13, 1997 and were received by the FCC on March 14, 1997.

In early 1997, a significant number of C-block licensees, experiencing difficulties in securing financing and facing the prospect of early default on their installment payments to the FCC, petitioned the FCC for relief from their licenses' installment payments.[7]  In February 1997, the FCC suspended the C-block installment payments and commenced rule-making proceedings to address the problems faced by C-block licensees.  Following six months of administrative proceedings, the FCC issued an order on October 16, 1997, the Restructuring Order, that provided C-block licensees with several options to ease their financial difficulties, including allowing a licensee to return all or portions of a license to the FCC in exchange for significant debt

---

[7]  These difficulties were generally limited to the winning bidders at the C-block auction, because the winning bids at the A, B, D, E, and F-block auctions were considerably lower than the winning bids at the C-block auction when measured in dollars per megahertz-pop, *see supra* note 1.  The average winning bid at the A and B-block auctions held in March 1995 was $.50 per megahertz-pop.  At the D, E, and F-block auctions concluded in January 1997, the average winning bid for the D and E-blocks, in cash, was approximately $.35 per megahertz-pop, and for the F-blocks, which like the C-block auction was reserved for qualified entities and thus subject to favorable ten-year financing, was $.25 per megahertz-pop.  In contrast, the average winning bid at the C-block auction in May 1996 was considerably higher per megahertz-pop. One of the reasons proffered for the steep decline in the value of C-block licenses after the May 1996 auction was the FCC's decision to auction the D, E, and F-blocks after the C-block auction was concluded but before the C-block licenses were to be issued, thereby greatly increasing the volume of licenses soon to be available for purchase at auction.  For a general survey of the difficulties facing C-block licensees, see Carolyn Hochstadter Dicker, *PCS Licenses and the "Specter" of Bankruptcy*, 6 COMMLAW CONSPECTUS 59 (1998).

reduction.  *See In re Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licenses*, 12 F.C.C.R. 16436, 1997 WL 643811 (Sept. 25, 1997).  The FCC, however, expressly rejected proposals that would have allowed licensees to retain their licenses without paying their winning bids in full, because, in the FCC's view, the C-block auction had been designed to ensure that the licenses were to be allocated to users who could demonstrate, through their ability to pay the highest price, that they possessed the most highly valued use for the licenses.  *See id*. ¶ 5. In response to numerous requests for reconsideration of the Restructuring Order, the FCC altered the Restructuring Order slightly in March 1998 to allow licensees greater flexibility in making their decisions regarding the options provided in the Restructuring Order; however, the basic framework of the Restructuring Order was retained. *See In re Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licenses*, 13 F.C.C.R. 8345, 1998 WL 130176 (Mar. 23, 1998).

The subsidiary debtors did not elect to pursue one of the options for relief presented by the FCC in the Restructuring Order.  Instead, on October 20, 1997, the subsidiary debtors filed voluntary bankruptcy petitions under chapter 11 in the Northern District of Texas.  On October 29, 1997, the subsidiary debtors initiated an adversary proceeding against the FCC, in part to avoid their payment obligations under the promissory notes executed in March 1997 on the basis that

7

those obligations constituted constructive fraudulent transfers for which the subsidiary debtors had received less than reasonably equivalent value, *i.e.*, the licenses were worth less than the notes, and had become insolvent as a result. On January 26, 1998, GWI and GWI PCS also filed for bankruptcy protection, and their chapter 11 cases were consolidated with those of the fourteen subsidiary debtors. In an amended complaint, GWI and GWI PCS joined the adversary proceeding against the FCC, seeking to avoid any obligation that they may have incurred to pay the balance of the bid price to the FCC. The FCC defended against the Debtors' attempt to avoid the obligations by arguing, *inter alia*, that the value of the licenses received by the Debtors should be measured as of the date the C-block auction closed, May 8, 1996, and that the sixteen GWI entities should be collapsed and treated as a single entity. In addition, the FCC maintained that, if the bankruptcy court allowed the subsidiary debtors to retain the licenses without paying the bid price, the FCC's regulatory authority will be effectively usurped through the bankruptcy proceeding and the terms of license ownership as set forth in FCC regulations will be improperly altered through bankruptcy.

After conducting a trial on the adversary proceeding from April 13, 1998 through April 17, 1998, the bankruptcy court in a bench ruling on April 24, 1998 granted the relief sought by the Debtors. The bankruptcy court found that, although the value of the fourteen C-block licenses on the date the auction closed, May 8, 1996, was $1.06 billion, the

8

licenses' value had declined to $166 million by January 27, 1997,[8] the date the FCC conditionally granted the licenses to the subsidiary debtors who then became obligated to pay the remaining balance of GWI PCS's bids.[9] In addition, the bankruptcy court found that when the subsidiary debtors executed the notes, they held assets totaling $2 million plus the fourteen licenses valued at $166 million with debts, represented by the notes, of approximately $954 million, thereby rendering the subsidiary debtors insolvent. The bankruptcy court also ruled that the GWI corporations were all separate legal entities, declining to treat them as one under the FCC's alter ego theory[10], and

---

[8] The bankruptcy court found that the licenses dropped in value to between $132 million and $200 million and appears to have simply split the difference in arriving at the $166 million figure.

[9] The bankruptcy court also determined that the value of the licenses did not change between January 27, 1997 and March 14, 1997; and that therefore, whether the transfer of the licenses from the FCC to the subsidiary became effective on January 27, 1997–the date the licenses were awarded–or on March 14, 1997–the date the notes securing the obligation to pay the remaining $954 million were received by the FCC–was of no moment to the value of the licenses for purposes of avoidance.

[10] With regard to this conclusion, the bankruptcy court stated as follows in its oral ruling:

"The separate corporations, all being separate legal entities, shall not be considered the alter ego of the parent debtor. The debtors perpetuated no sham or fraudulent transaction on the government. Indeed, the debtors acted in good faith, following all FCC regulations and rules. The government has not established the applicability of any common law alter ego theory.

The government contends, however, that federal case law recognizes situations when corporate form should be ignored, if necessary, to preserve or protect some public policy.

. . .

refused to set the date the auction closed, May 8, 1996, as the date to evaluate the transfer of the licenses, because the bankruptcy court reasoned that it was not until January 27, 1997 that the licenses were issued by the FCC and the transfer completed. Thus, January 27, 1997 became the date for determining avoidability of the notes. The bankruptcy court therefore ruled that the obligation incurred to the FCC above the actual value of the licenses on January 27, 1997, or $894 million, was a constructive fraudulent transfer, avoidable under 11 U.S.C. § 548[11].

> As the Court has found, there is no evidence of a fraud or that the corporate structure was used as a sham. GWI had legitimate business purposes for the use of the corporate form, which the FCC recognized as common and approved. The subsidiaries were not created to be a conduit or agent . . ., but to be operating entities in their respective areas of the country. This Court should, therefore, honor the separate corporate entities."

Before the bankruptcy court, the FCC sought to hold GWI responsible for the notes and bids under an alter ego theory. As GWI did not participate in the actual bidding at the C-block auction and did not sign any promissory notes, in the absence of alter ego, GWI incurred no obligation towards the unpaid balance of the bid price. The FCC did not appeal the foregoing finding to the district court and does not raise it before this Court.

[11] 11 U.S.C. § 548, prior to being amended in 1998, stated as follows:
> "(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily–
> > (1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

10

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

(b) The trustee of a partnership debtor may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, to a general partner in the debtor, if the debtor was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

(d)(1) For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

(2) In this section—

(A) 'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a

The bankruptcy court similarly avoided GWI PCS's obligation to the FCC, reasoning that GWI PCS did not incur any obligation to pay the remainder of the $1.06 billion auction price for the licenses until the remaining five percent down-payment was made, the formal application for the licenses was submitted, and the licenses were obtained after the FCC's regulatory process and review. Therefore, the bankruptcy court concluded that GWI PCS's obligation to pay the remainder of the bid price was not incurred until January 27, 1997. The bankruptcy court also rejected the FCC's argument that non-payment of the entire obligation resulted in cancellation of the licenses. On June 4, 1998, the bankruptcy court entered judgment on the avoidance claim[12], reducing

---

relative of the debtor;
    (B) a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency that receives a margin payment, as defined in section 101(34), 741(5), or 761(15) of this title, or settlement payment, as defined in section 101(35) or 741(8) this title, takes for value to the extent of such payment;
    (C) a repo participant that receives a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, in connection with a repurchase agreement, takes for value to the extent of such payment; and
    (D) a swap participant that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer." 11 U.S.C. § 548 (1996).

[12] In its final judgment on the avoidance claims, the bankruptcy court ordered, in relevant part, that:
"1.    the obligations that GWI PCS, Inc. ("PCS") incurred to the United States, acting through the Federal Communications Commission ("FCC"), on May 8, 1996 are not avoided because as of that date, PCS received reasonably equivalent value in exchange for those

the remaining payment obligations for the fourteen licenses from approximately $954 million to $60 million[13], which amount is secured by the licenses.[14]  The FCC then appealed the avoidance order to the district court, maintaining that the Debtors remained obligated for the full face value of the notes and that the bankruptcy court erred in

> obligations;
> 2.    the obligations that GWI PCS 1, Inc., GWI PCS 2, Inc., GWI PCS 3, Inc., GWI PCS 4, Inc., GWI PCS 5, Inc., GWI PCS 6, Inc., GWI PCS 7, Inc., GWI PCS 8, Inc., GWI PCS 9, Inc., GWI PCS 10, Inc., GWI PCS 11, Inc., GWI PCS 12, Inc., GWI PCS 13, Inc., and GWI PCS 14, Inc. (the "Subsidiary Debtors") and PCS incurred to the United States, acting through the FCC, on January 27, 1997 are avoided pursuant to 11 U.S.C. § 548(a)(2)(A) and (B)(i) & (ii), because the Subsidiary Debtors and PCS did not receive reasonably equivalent value in exchange for these obligations, and on this date, the Subsidiary Debtors and PCS were or became insolvent and were undercapitalized for the contemplated business activity they intended to pursue;
> 3.    pursuant to 11 U.S.C. § 548(c), the obligations of PCS and the Subsidiary Debtors to the United States are reduced to a $60 million, which amount is the difference between the value of the obligations as of January 27, 1997 -- $166 million -- and the $106 million already paid on the obligations, and which amount is secured by the licenses issued by the FCC to the Subsidiary Debtors."

[13]  The $60 million figure represents the value of the licenses on January 27, 1997, $166 million, less the two $53 million down-payments made by GWI.

[14]  As an alternative remedy to avoidance, the Debtors moved the bankruptcy court to rescind the notes.  Avoidance differs considerably from rescission.  Rescission unwinds the transaction and restores the status quo ante, whereas avoidance allows a debtor to retain the benefit of its bargain while rewriting the debtor's obligations under that bargain.  The bankruptcy court declined to order a rescission of the notes, *see* 11 U.S.C. §§ 105 & 550, as it would have required a reauction of the fourteen licenses, resulting in further delay in the development of licenses by small business, in contravention to Congress's mandate in § 309(j) of the FCA.

avoiding approximately $894 million of the subsidiary debtors' and GWI PCS's obligation to the FCC.[15]

Over the FCC's objection, the bankruptcy court proceeded to confirm a plan of reorganization, which incorporated its prior ruling that avoided $894 million of the subsidiary debtors' and GWI PCS's obligation to the FCC and enjoined the FCC from taking any action to revoke the fourteen licenses[16]. The reorganization plan contained two possible outcomes of the reorganization effort. The first option, labeled the "Business Alternative," provided for the Debtors raising money in the financial markets and continuing with their original plan to offer wireless communications services. In the event the Business Alternative failed, the plan also provided for a "Litigation Alternative," under which the Debtors would return the fourteen licenses to the FCC and pursue litigation against the FCC to recover the $106 million down-

---

[15]    On appeal to the district court, the FCC presented four arguments: (1) the subsidiary debtors and GWI PCS had incurred a binding obligation to pay the bid price for the licenses on May 8, 1996, the date the auction closed; (2) permitting the subsidiary debtors to retain the licenses without complying fully with the terms of the bid would unlawfully alter the terms for C-block license ownership established by FCC regulations; (3) the bankruptcy court erred in extinguishing, rather than subordinating, the FCC's claim in excess of $166 million; and (4) the bankruptcy court erred in its valuation of the licenses on January 27, 1997 at $166 million. Notably, the FCC did not appeal the bankruptcy court's determination that the debtor entities should not be collapsed or treated as one entity under an alter ego theory.

[16]    The confirmation order, in relevant part, states as follows: "[It is further] ORDERED that on and after the Effective Date, the FCC shall be and hereby is enjoined from taking any action whatsoever against the Debtors to revoke their PCS licenses in connection with any claim, transaction or occurrence which arose prior to the Effective Date . . . ."

14

payment for the licenses, which would then be distributed among the Debtors' creditors. On September 10, 1998, the bankruptcy court, pursuant to 11 U.S.C. § 1129, entered an order confirming the plan of reorganization. Under the reorganization plan, the subsidiary debtors and GWI PCS were obligated to pay the FCC $60 million at a six-and-one-half per cent rate of interest; this $60 million obligation was secured by the licenses. The bankruptcy court also modified the reorganization plan to preserve certain issues raised in the appeal of the avoidance judgment.[17] In short, if a reviewing court did not affirm the avoidance judgment and determined that the bankruptcy court's valuation of the licenses was incorrect, the FCC would receive an increased secured claim

---

[17] In the confirmation order, the bankruptcy court provided that:

"[It is further] ORDERED that in the event the Avoidance Judgment is not finally affirmed on appeal, and the appellate process results in a judgment producing a claim for the FCC in an amount in excess of $60 million, the FCC's secured claim, for purposes of the Plan and treatment thereunder, shall be increased from $60 million to the lesser of (i) the amount of the claim produced by the final judgment or (ii) the amount of the claim produced by the average price per pop bought at the FCC re-auction of C Block licenses in March 1999 multiplied by the number of the pops covered by the Debtors' licenses; and it is further

[] ORDERED that if the amount of the FCC's claim as determined on appeal is greater than the value established at the reauction, the FCC shall have an unsecured claim against the Debtors for the difference between the amount determined by the reauction and the amount determined on appeal, payable on a pro rata basis from the Unsecured Creditors' Fund with all other Unsecured Claims."

The reorganization plan did not provide for an unsecured claim for the FCC, but did establish a creditors' fund of $18 million for the payment of all unsecured claims in the event that the avoidance judgment was reversed or modified on appeal, thus keeping available funds if the FCC became entitled to an unsecured claim.

15

equal to the lesser of (1) the amount determined by final judgment, or (2) the average price produced at the FCC's reauction of C-block licenses scheduled for March 1999[18]. If the amount of the FCC's claim determined on appeal was greater than the price at the reauction, the FCC's claim would be bifurcated under 11 U.S.C. §§ 502 & 506, with the FCC receiving an additional unsecured claim for the difference between the amount determined at the reauction and the amount determined on appeal, payable out of the creditors' fund (see note 17, *supra*) on a pro rata basis with other unsecured creditors. In preserving the FCC's appellate rights, the bankruptcy court sought to provide a fair and equitable means for the FCC to protect its interest in the licenses without unduly hindering the Business Alternative and the Debtors' ability to finance and implement the reorganization plan.

The FCC appealed the confirmation order to the district court. The district court, having appellate jurisdiction under 28 U.S.C. § 158(a)[19],

---

[18] The reauction began on March 23, 1999 and concluded on April 20, 1999. The average bid price per pop of a C-block license bought at the reauction was $3.88. As the subsidiary debtors' 14 licenses cover approximately 17.9 million pops, the amount of the claim produced by the average price per pop bought at the FCC reauction of the C-block licenses multiplied by the number of the pops covered by the subsidiary debtors' licenses would total approximately $69,452,000.

[19] 28 U.S.C. § 158(a) provides as follows:
    "(a) The district courts of the United States shall have jurisdiction to hear appeals[]
            (1) from final judgments, orders, and decrees;
            (2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
                (3) with leave of the court, from other

16

consolidated the FCC's appeal of the confirmation order and its appeal of the avoidance judgment. The FCC also sought a stay of both the adversary judgment and the confirmation order of the bankruptcy court. The district court entered a temporary stay on September 10, 1998, which expired by its terms on September 30, 1998. On September 30, 1998, the then-Chief Judge of this Court issued a stay "to preserve the status quo and jurisdiction until . . . this court ha[s] an appropriate opportunity to determine whether to stay the Avoidance Decision and the Confirmation Decision until appeals therefrom are finally resolved." *In re United States*, No. 98-11123 (5th Cir. Sept. 30, 1998) (unpublished). This stay was lifted by this Court on October 7, 1998. *In re United States*, No. 98-11123 (5th Cir. Oct. 7, 1998) (*per curiam*) (unpublished). No further stay was secured by the FCC.

While the FCC's consolidated appeals remained pending in the district court, the Debtors proceeded, in the absence of a stay, to perform some of the transactions set forth in the Business Alternative. On October 29, 1998, the Debtors moved to dismiss the entirety of the FCC's appeal of the confirmation order and partially dismiss the FCC's appeal of the avoidance judgment, because the reorganization plan had

---

        interlocutory orders and decrees;
    and, with leave of the court, from interlocutory orders and
    decrees, of bankruptcy judges entered in cases and
    proceedings referred to the bankruptcy judges under section
    157 of this title. An appeal under this subsection shall be
    taken only to the district court for the judicial district
    in which the bankruptcy judge is serving."

17

been substantially consummated.[20] The FCC opposed the motion to dismiss its appeal, and when the district court had not ruled on the FCC's appeals nearly ten months later, the Debtors sought a writ of mandamus from this Court directing the district court to issue a decision. The mandamus petition was denied when the district court indicated that it would rule by September 30, 1999. *In re GWI PCS 1, Inc.*, No. 99-10923

---

[20] The Debtors listed the following financial transaction as having been conducted: (1) equity investors having provided approximately $5.1 million in funding to the Debtors; (2) equity investors having signed notes with a face value of approximately $5.1 million payable to the Debtors and the Debtors having drawn upon $4.4 million of these funds; (3) Lucent Technologies having funded $30 million to the Debtors; (4) a $28 million payment by the Debtors to Hyundai Electronics of America; (5) the Debtors' funding their contemplated professional fees; (6) the retention of Prudential Securities, Inc., as a financial advisor and lead manager of the Debtors' high yield debt offering, including a $150,000 non-refundable retainer paid to Prudential; (7) paying an initial distribution to unsecured creditors holding allowed claims; (8) paying the majority of the Debtors' remaining administrative expenses; (9) the Debtors' issuing $5 million in preferred stock; (10) the subsidiary debtors signing new notes and security agreements in favor of the FCC; (11) the Debtors' payment to the FCC of the first installment on the licenses, approximately $2 million; (12) payment of the Debtors' regular operating expenses, including payroll, payroll taxes, property and equipment lease payments, and other normal operating business expenses; (13) a $1.6 million payment from to the Debtors to Lucent Technologies in commitment fees on credit facilities provided by Lucent; (14) the Debtors' entering into binding contracts by executing purchase orders to acquire $3 million of fast start services to design and construct their wireless network; (15) the Debtors, with the assistance of Lucent Technologies, having begun implementation of the design plans for their network and the purchase of sophisticated equipment for use therein; (16) the employment of Arthur Anderson to perform audit services for the years 1997 and 1998; (17) the Debtors having incurred other post-consummation fees in excess of $150,000 in connection with the preparation of the offering memorandum; and (18) the filing of UCC-1 financial statements with the Secretary of State of Texas on behalf of Lucent Technologies. Before the district court, the FCC did not dispute that these transactions had occurred.

(5th Cir. Aug. 25, 1999) (unpublished).

On September 27, 1999, the district court issued a decision, concluding that the Debtors had substantially consummated the plan of reorganization under the Business Alternative[21] and dismissing as equitably moot the FCC's appeal of the confirmation order and part of the FCC's appeal from the avoidance judgment. *See United States v. GWI PCS 1, Inc.*, 245 B.R. 59, 64 (N.D. Tex. 1999). Without identifying the portions of the avoidance appeal that remained before it, the district court held simply that "the court denies the United States' remaining claims with respect to the Avoidance Judgment." *Id*. On September 30, 1999, the district court entered judgment "in accordance with the court's order of September 27, 1999", affirming the bankruptcy court's orders.[22]  The FCC timely appealed to this Court.

### Discussion

The FCC asserts that the district court erred in three respects: (1) dismissing portions of its appeal under the doctrine of equitable mootness; (2) affirming the bankruptcy court's avoidance judgment,

---

[21]  In fact, the bankruptcy court had closed the Debtors' bankruptcy estates in July 1999, finding them to have been fully administered.

[22]  The Debtors had cross-appealed the confirmation order to the district court, arguing that the bankruptcy court's requiring the Debtors to reserve funds when the FCC's claim was disallowed and determining that the FCC had an impaired claim due solely to the pendency of the appeal of the avoidance judgment were erroneous. *See id.* at 64-65.  The district court denied the Debtors' claims, *see id*. at 65, and the Debtors do not renew these contentions on appeal to this Court.

19

despite its effect on the regulatory authority of the FCC over the licenses; and (3) affirming the bankruptcy court's decision that the subsidiary debtors' and GWI PCS's obligation to the FCC was an avoidable transfer. We will first address equitable mootness and then turn to the FCC's remaining arguments that are not equitably moot.

I    Equitable Mootness

At the outset, the parties disagree as to the standard of review this Court should apply when examining a district court's dismissal of an appeal as equitably moot. The FCC argues that, although the fact findings by the district court should be accepted unless clearly erroneous, the ultimate decision that an appeal is equitably moot remains a legal determination to be reviewed *de novo*. Conversely, the Debtors contend that we should review the district court's dismissal of the FCC's appeal for abuse of discretion–the standard employed by the Third and D.C. Circuits. *In re Continental Airlines*, 91 F.3d 553, 560 (3d Cir. 1996) (*en banc*); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1148 (D.C. Cir. 1986). In *In re Berryman Products, Inc.*, 159 F.3d 941 (5th Cir. 1998), we affirmed the district court's dismissing as moot a challenge to the confirmation of a reorganization plan of a chapter 11 debtor. *See id*. at 946. We prefaced our discussion of whether the challenge was moot with the following statement regarding our standard of review: "In the bankruptcy appellate process, we perform the same function as did the district court: Fact findings of the bankruptcy court are reviewed under a clearly erroneous standard and issues of law

20

are reviewed *de novo*." *Id*. at 943 (footnote omitted); *see In re Manges*, 29 F.3d 1034, 1038-44 (5th Cir. 1994) (undertaking an independent review of the district court's dismissal of the debtors' appeal of the confirmation order).[23]  Accordingly, we agree with the FCC and will employ this standard in reviewing the district court's ruling on equitable mootness in the case *sub judice* as well.

Equitable mootness "is not an Article III inquiry as to whether a live controversy is presented; rather, it is a recognition by the appellate courts that there is a point beyond which they cannot order fundamental changes in reorganization actions." *In re Manges*, 29 F.3d at 1038-39 (citation omitted).  "Consequently, a reviewing court may decline to consider the merits of a confirmation order when there has been substantial consummation of the plan such that effective judicial relief is no longer available–even though there may still be a viable dispute between the parties on appeal." *Id*. at 1039 (citations omitted).  When evaluating whether an appeal of a reorganization plan in a bankruptcy case is moot, this Court examines whether (1) a stay has been obtained, (2) the plan has been substantially consummated, and (3) the relief requested would affect either the rights of parties not before the court or the success of the plan. *See In re U.S. Brass*

---

[23]  The Second and Eleventh Circuits have also adopted this standard. *See In re Burger Boys, Inc.*, 94 F.3d 755, 759 (2d Cir. 1996); *In re Club Assoc.*, 956 F.2d 1065, 1069 (11th Cir. 1992). *See also In re Western Pac. Airlines, Inc.*, 181 F.3d 1191, 1194 (10th Cir. 1999); *In re Filtercorp, Inc.*, 163 F.3d 570, 576 (9th Cir. 1998) (both reviewing mootness *de novo*).

21

*Corp.*, 169 F.3d 957, 959 (5th Cir. 1999) (citing *In re Berryman Prods.*, 159 F.3d at 944; *In re Manges*, 29 F.3d at 1039).[24] We consider each in turn.

### A. Failure to Obtain a Stay

The first question in a mootness inquiry is whether the FCC secured a stay to prevent execution of the reorganization plan. "[T]he requirement of a stay encapsulates the fundamental bankruptcy policy of reliance on the finality of confirmation orders by the bankruptcy court." *In re Berryman Prods.*, 159 F.3d at 944 (footnote and citations omitted).[25] Although the FCC secured a temporary stay from the district

---

[24] As we stated in *Manges*:
"'The test for mootness reflects a court's concern for striking the proper balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy order adversely affecting him.'" *In re Manges*, 29 F.3d at 1039 (quoting *In re Club Assoc.,* 956 F.2d at 1069).
The Eleventh Circuit considers an additional factor–whether the relief sought would affect the reemergence of the debtor as a revitalized entity. *See In re Club Assoc.*, 956 F.2d at 1069 n.11.

[25] The Seventh Circuit has explained that:
"The significance of an application for a stay lies in the opportunity it affords to hold things in stasis, to prevent reliance upon the plan of reorganization while the appeal proceeds. A stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization. And it is the reliance interests engendered by the plan, coupled with the difficulty of reversing critical transactions, that counsels against attempts to unwind things on appeal. Every incremental risk of revision of appeal puts a cloud over the plan of reorganization, and derivatively over the assets of the reorganized firm." *In re UNR Indus.*, 20 F.3d 766, 769-70 (7th Cir. 1994) (quoted in *In re Manges*, 29 F.3d at 1040).

court on September 10, 1998 and from this Court on September 30, 1998, the stay was lifted on October 7, 1998 and no further stays were effectuated.

The FCC argues that "third parties are well aware of the government's position that licensees such as GWI are not entitled to retain licenses without paying the full amount of the winning auction bid. Investors' knowledge of that position, as well as the pendency of this appeal, appears to have had the same effect as a stay." This contention, however, has no bearing on whether a stay has or has not been obtained; rather, this point instructs our determination of whether the reorganization plan has been substantially consummated and the effect on parties not before the court–the second and third factors in our equitable mootness analysis–and cannot serve as a proxy for a judicial stay of the reorganization plan. In the absence of a stay, the reorganization plan became effective and has been implemented since October 7, 1997. This factor therefore militates in favor of dismissal for mootness.

B.    Substantial Consummation of the Reorganization Plan

The second consideration in the mootness inquiry is whether the reorganization plan has been substantially consummated. We have adopted the "'substantial consummation' yardstick because it informs our judgment as to when finality concerns and the reliance interests of third parties upon the plan as effectuated have become paramount to a resolution of the dispute between the parties on appeal." *In re Manges*,

23

29 F.3d at 1041 (citations omitted). According to 11 U.S.C. § 1101(2):

> "'[S]ubstantial consummation' means–
> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
> (C) commencement of distribution under the plan."

The FCC and the Debtors dispute whether the reorganization plan has been substantially consummated. The Debtors reiterate on appeal the numerous transactions completed following the confirmation of the reorganization plan, *see supra* note 20, that persuaded the district court to "conclude[] that the reorganization plan ha[d] been substantially consummated because substantially all of the property proposed by the plan to be transferred has been transferred, Debtors are managing substantially all of the property dealt with by the plan, and distribution under the plan has commenced." *GWI PCS 1, Inc.*, 245 B.R. at 63. Although the FCC does not contest that these transactions have occurred, the FCC maintains that they do not satisfy the "substantially consummated" standard for three reasons: (1) only "insiders", *i.e.*, plan participants, have provided funding for the Debtors in the reorganization and have been paid funds in the reorganization and thus lack a good faith expectation that the FCC's appeal would not be successful; (2) the Debtors have not obtained the $250 million in financing set forth in the reorganization plan and thus have been unable to create a wireless communications system; and (3) the "Litigation Alternative" in the reorganization plan contemplated ongoing litigation

24

between the FCC and the Debtors, thereby not making return of licenses to the FCC and consummation of the plan mutually exclusive. We disagree with the FCC and conclude that the reorganization plan has been substantially consummated.

First, the FCC's argument that only "insiders" have provided financing to the Debtors and have received payments from the Debtors and therefore lack good faith reliance on the reorganization plan, even if true, has never been a consideration in determining whether a reorganization has been substantially consummated. *See In re Continental Airlines*, 91 F.3d at 565 ("While we agree that reliance of the Investors and others on the unstayed Confirmation Order is of central importance to our [equitable mootness] analysis, to focus on the 'reasonableness' of that reliance, at least as measured by the likelihood of reversal on appeal, is necessarily a circular enterprise and therefore of little utility. . . . Our inquiry should not be about the 'reasonableness' of the Investors' reliance or the probability of either party succeeding on appeal."); *cf. In re Sullivan Cent. Plaza, 1, Ltd.*, 914 F.2d 731, 734-35 (5th Cir. 1990) (refusing to consider the alleged lack of good faith by a purchaser of debtor property in determining whether an appeal was moot under 11 U.S.C. § 363(m)).[26] Moreover, it would be natural for many, if not a majority, of the transactions set forth in a reorganization plan to involve the

---

[26] This is not to deny the relevance of such matters to the issue of whether or not a stay should be granted in the first place.

25

participants of the chapter 11 proceedings.  Therefore, this argument fails.

Second, the FCC contends that the Debtors have yet to obtain all the financing required under the reorganization plan and have neither constructed nor made operable a personal communications system.  The Debtors respond that, although additional financing is required for the completion of the personal communications system, the effectiveness of the reorganization plan does not necessarily depend on obtaining such financing.  We agree.  Our standard requires only "substantial consummation," not absolute or complete consummation.  The Debtors' failure to acquire full financing does not take away from the transactions that have been completed, see supra note 20.  Accordingly, this argument does not mandate a conclusion that substantial consummation has not been achieved.

Third, the FCC maintains that, despite the transactions that have occurred, the contemplation of the return of the licenses to the FCC in the Litigation Alternative precludes a finding of substantial consummation.  As the Debtors point out, however, no steps have been taken towards the Litigation Alternative; instead, it has been eschewed in favor of the Business Alternative with a number of transactions having been completed in furtherance of the Business Alternative.  More importantly, the reorganization plan's provision of the Litigation Alternative bears more upon the effect of allowing the FCC's appeal to be considered on third parties, not on whether the reorganization plan,

as implemented through the Business Alternative, has been substantially consummated. Therefore, we agree with the Debtors and the district court[27] that substantial consummation has been achieved; therefore, this factor weighs in favor of dismissal.

C.    Effect on Parties Not Before the Court

The final question in the mootness inquiry involves whether the requested relief would affect the rights of parties not before the court or the success of the reorganization plan. *See In re Berryman Prods., Inc.*, 159 F.3d at 945-46. As we stated in *Manges*, "'[s]ubstantial consummation of a reorganization plan is a momentous event, but it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief.'" *In re Manges*, 29 F.3d at 1042-43 (quoting

---

[27]    On this point, the district court ruled as follows:
"Although the United States agrees that these transactions have taken place, it does not believe that they constitute substantial consummation. The court disagrees. Upon review of the pleadings filed and the appellate record, the court concludes that the reorganization plan has been substantially consummated because substantially all of the property proposed by the plan to be transferred has been transferred, [the] Debtors are managing substantially all of the property dealt with by the plan, and distribution under the plan has commenced. The United States also disputes substantial consummation because the Litigation Alternative exists as a part of the confirmed reorganization plan. Again, the court disagrees. As discussed above, the court concludes that substantial consummation of the plan, by way of the Business Alternative, has already taken place irrespective of the possibility of implementation of the Litigation Alternative whereby the licenses would be returned to the FCC, and litigation for the benefit of the creditors and equity would be initiated to attempt to recover the payments made by [the] Debtors to the FCC. Accordingly, the second factor also weighs in favor of dismissal of the appeal as moot." *GWI PCS 1, Inc.*, 245 B.R. at 63-64.

27

*In re Chateaugay Corp.*, 10 F.3d 944, 952 (2d Cir. 1993)) (alteration in original). Here, we must evaluate the transactions that have occurred under the reorganization plan against the backdrop of the relief sought by the FCC–reinstatement of the full $954 obligation under the notes and bid price and the increased risk of revocation of the licenses for failure to satisfy the increased obligation. Despite the inclusion of the Litigation Alternative in the reorganization plan, it remains obvious that saddling the subsidiary debtors with an additional $894 million obligation would have a detrimental affect on the post-bankruptcy investors and entities and on the success of the Business Alternative, which was the route preferred by the majority of the bankruptcy participants in resolving the Debtors' chapter 11 petition. In sum, it appears quite unlikely that we could place the Debtors' estates or the third parties back into the status quo as it existed before the avoidance judgment if we were to unravel this important and fundamental aspect of the reorganization plan at this time. Therefore, we conclude that this factor also weighs heavily in favor of mooting the FCC's appeal.[28]

---

[28] In its consideration of this factor, the district court stated as follows:

"[T]he court must determine whether the granting of relief on appeal would affect the rights of third parties not before the court or the success of the plan. Upon review of the pleadings filed and the appellate record, the court concludes that the granting of the relief which the United States seeks on appeal would affect the rights of third parties not before the court and the success of the plan. The various investors and entities which have consummated transactions with Debtors since the entry of the Confirmation

28

D.  Application of Equitable Mootness to the FCC's Arguments

As all three factors weigh in favor of the district court's dismissal of part of the FCC's appeal, we hold that the district court properly granted the Debtors' motion to dismiss. Having concluded that equitable mootness applies, we now turn to what it applies to. As the FCC properly concedes that its challenge to the authority of the bankruptcy court to permit the subsidiary debtors to retain the licenses and the subsidiary debtors and GWI PCS to avoid $894 million of the subsidiary debtors' and GWI PCS's obligation to pay the full bid price for the licenses, does not amount to a contention that the bankruptcy court actually lacked *jurisdiction,* as such, to enter any portion or portions of the complained of orders,[29] we hold this challenge is

---

Order, and the confirmation plan itself, would be detrimentally affected if [the] Debtors were suddenly obligated to the FCC for an additional $900 million. The third factor, therefore, weighs in favor of dismissal of the appeal as moot." *GWI PCS 1, Inc.*, 245 B.R. at 64.

[29]  The bankruptcy court's enjoining the FCC from revoking the licenses and avoiding the majority of the obligations under the notes was within its jurisdiction to preserve property of the estate, *see* 11 U.S.C. § 541, and further the reorganization plan. In addition, 11 U.S.C. § 106 renders the United States and the FCC subject to the bankruptcy proceedings. Section 106 states as follows:
"(a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:
    (1) Sections 105, 106, 107, 108, 303, 346, 362, 363, 364, 365, 366, 502, 503, 505, 506, 510, 522, 523, 524, 525, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 722, 724, 726, 728, 744, 749, 764, 901, 922, 926, 928, 929, 944, 1107, 1141, 1142, 1143, 1146, 1201, 1203, 1205, 1206, 1227, 1231, 1301, 1303, 1305, and 1327 of this title.

equitably moot.  Although the bankruptcy court possibly *erred* in

permitting avoidance and enjoining the FCC from revoking the subsidiary

debtors' licenses for failing to remit the full bid price, thereby

>         (2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.
>         (3) The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages.  Such order or judgment for costs or fees under this title or the Federal Rules of Bankruptcy Procedure against any governmental unit shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28.
>         (4) The enforcement of any such order, process, or judgment against any governmental unit shall be consistent with appropriate nonbankruptcy law applicable to such governmental unit and, in the case of a money judgment against the United States, shall be paid as if it is a judgment rendered by a district court of the United States.
>         (5) Nothing in this section shall create any substantive claim for relief or cause of action not otherwise existing under this title, the Federal Rules of Bankruptcy Procedure, or nonbankruptcy law.
>     (b) A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose.
>     (c) Notwithstanding any assertion of sovereign immunity by a governmental unit, there shall be offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate." 11 U.S.C. § 106.

Moreover, 28 U.S.C. § 1334(b), which provides district courts with jurisdiction over all civil proceedings arising under title 11, or arising in or related to cases filed under title 11, "[n]otwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts," and 28 U.S.C. § 157 grant the bankruptcy court jurisdiction to consider the Debtors' avoidance claims.

taking onto itself a quasi-regulatory function held by the FCC, the FCC's challenge on this point and request that the avoidance judgment, in its entirety, and the enjoinment order, be reversed are barred by equitable mootness.

The Second Circuit's decision, *In re NextWave Personal Communications, Inc.*, 200 F.3d 43 (2d Cir. 1999) (*per curiam*), *cert. denied*, No. 99-1980 (U.S. Oct. 10, 2000), although casting doubt on the merits of the bankruptcy court's assuming a quasi-regulatory role, does not dissuade us from ruling that the FCC's challenge on this issue is equitably moot. NextWave Personal Communications, Inc. (NextWave), like GWI PCS, was the high bidder for C-block licenses at the FCC's 1995-96 C-block auction. *See id*. at 46. Similar to nearly all winning bidders for C-block licenses, NextWave experienced financial difficulties and on June 8, 1998 "filed a Chapter 11 petition and instituted an adversary proceeding against the FCC that sought to avoid the company's obligations resulting from its acquisition of the Licenses." *Id*. at 48. The bankruptcy court granted NextWave's relief in the adversary proceeding, finding that the transaction in which it had acquired the licenses was a fraudulent transfer subject to avoidance. *See id*. at 50. Accordingly, the bankruptcy court reduced NextWave's obligation to the FCC from $4.74 billion to $1.02 billion.[30] *See id*. The Second Circuit

---

[30] As in the present case, the bankruptcy court valued the licenses as of the date the notes securing NextWave's obligation were executed, not on the closing date of the C-block auction. *See id*. at 49-50. The bankruptcy court also credited NextWave with its $474 million in down-payments, leaving approximately $549 million in payment

31

reversed the bankruptcy court's avoidance judgment, concluding that the bankruptcy court improperly "exercised the FCC's radio-licensing function." *Id*. at 55. In contrast to the present case where the district court dismissed this claim by the FCC as equitably moot, the district court in *NextWave* had "affirmed [the avoidance judgment] for substantially the reasons stated by the bankruptcy court." *Id*. at 50 (citing *In re NextWave Personal Communications, Inc.*, 241 B.R. 311 (S.D.N.Y. 1999)). The district court in *NextWave* did not find the FCC's appeal to be equitably moot, nor did the Second Circuit consider that issue. In fact, the FCC had successfully obtained a stay in *NextWave* and NextWave did not have a confirmed reorganization plan to consummate. Accordingly, mootness was not at issue. Therefore, although the Second Circuit's decision supports the FCC's substantive merits argument, it does not prevent the FCC's challenge on this issue from being equitably moot.[31]

The reorganization order, however, preserved certain challenges to the valuation of the licenses and the amount of a the FCC's claim against the Debtors. In light of the results of the March 1999 reauction of C-block licenses, *see supra* note 18, the remedy now

_____

left to be made to the FCC. *See id*. at 50.

[31] Indeed, if the issue were not equitably moot, we might agree with the Second Circuit and reverse the bankruptcy court's avoidance judgment. However, that is not the case before us, and we need not and do not decide the matter. We observe that no party has urged before us the applicability, or otherwise, of 11 U.S.C. § 362(b)(4), or indeed even cited that section to us.

available to the FCC is necessarily limited to an unsecured claim for any amount the FCC's claim is determined on appeal to be in excess of the average winning bid at the March 1999 C-block reauction, *see supra* notes 17 and 18.  At oral argument, counsel for the Debtors conceded that the reorganization plan preserved two grounds for the FCC to appeal: (1) the valuation of the licenses as of January 27, 1997; and (2) when the subsidiary debtors' and GWI PCS's obligation to the FCC arose.  These challenges can not result in the revocation of the licenses, but rather only in the recoupment of more money by the FCC as an unsecured claim.  We now turn to the FCC's contention that the bankruptcy court erred in avoiding $894 million of the subsidiary debtors' and GWI PCS's obligation to the FCC, keeping in mind that the avoidance judgment cannot now be vacated and the only remedy available to the FCC is an unsecured claim (payable only out of the $18 million Unsecured Creditors' Fund, see notes 17 and 18, *supra*).

II    The Avoidance Judgment

The bankruptcy court avoided approximately $894 million of the subsidiary debtors' and GWI PCS's obligation to the FCC as a constructive fraudulent transfer under 11 U.S.C. § 548(a)(2) (1996)[32]. The elements of a claim of constructive fraud under section 548(a)(2) are that: (1) the debtor transferred an interest in property; (2) the transfer of that interest occurred within one year prior to the filing of the bankruptcy petition; (3) the debtor was insolvent on the date of

---

[32]   See note 11, *supra.*

33

the transfer or became insolvent as a result thereof; and (4) the debtor received less than reasonably equivalent value in exchange for such transfer. *See In re McConnell*, 934 F.2d 662, 664 (5th Cir. 1991); *see also In re XYZ Options, Inc.*, 154 F.3d 1262, 1275 (11th Cir. 1998); *Butler v. Lomas and Nettleton Co.*, 862 F.2d 1015, 1017 (3d Cir. 1988); *cf. Burroughs v. Fields*, 546 F.2d 215, 218 (7th Cir. 1976) (interpreting 11 U.S.C. § 107, the predecessor to 11 U.S.C. § 548). The FCC does not appeal the bankruptcy court's valuation of the licenses as of January 27, 1997, or March 14, 1997, nor does the FCC contend that the subsidiary debtors or GWI PCS were solvent as of January 27, 1997 or March 14, 1997. Therefore, any such arguments have been waived. However, the FCC does contest the bankruptcy court's decision to choose January 27, 1997 (or March 14, 1997) as the appropriate date for the avoidance inquiry. The Debtors bear the burden of establishing the date the transfer occurred. *See In re McConnell*, 934 F.2d at 665 n.1; *In re Morris Communications NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990). The bankruptcy court's determination on this issue involves a mixed question of law and fact, which we review *de novo* (although findings of historic facts are accepted unless clearly erroneous). *See In re Southmark Corp.*, 62 F.3d 104, 106 (5th Cir. 1995) (citing *Barnhill v. Johnson*, 112 S.Ct. 1386, 1389 (1992)).

The date on which the payment obligation arose is crucial to whether this obligation is avoidable. First, if the subsidiary debtors and GWI PCS incurred the obligation at the close of the auction, May 8,

1996, then the value of the fourteen licenses would be $1.06 billion. And if the fair market value were $1.06 billion, then the consummation of the notes would not be a constructive fraudulent transfer. On the other hand, if their obligation first arose on or about the date on which the licenses were conditionally granted, January 27, 1997, or on March 14, 1997, then the $954 million obligation represented by the notes substantially exceeded the fair market value of the licenses. Second, if the obligation arose on May 8, 1996, then it would not have been incurred within one year of the filing of the Debtors' bankruptcy petitions and would therefore not have been avoidable. In support of its position that the obligation arose on the date the C-block auction closed, the FCC relies on the following: (1) its own interpretation of its regulations; (2) auction law principles; and (3) the Second Circuit's *NextWave* decision, which relies on (1) and (2). In response, the subsidiary debtors and GWI PCS assert that the FCC's interpretation does not warrant deference and that the bankruptcy court correctly fixed January 27, 1997 as the appropriate date, because the FCC's own regulations provide that the licenses were not transferred and the full bid price incurred until January 27, 1997. We conclude that the bankruptcy court did not err in evaluating the transfer as of January 27, 1997.

We first address the FCC's argument that this Court should defer to the FCC's formal interpretation that under its regulations the binding obligation to pay the full bid price attaches "upon the

35

acceptance of the high bid." *In re Applications for Assignment of Broadband Personal Communications Servs. Licenses*, 14 F.C.C.R. 1126 ¶ 1, 1998 WL 889489 (Dec. 23, 1998); *see In re C.H. PCS, Inc.*, 14 F.C.C.R. 4131 ¶ 3, 1999 WL 24950 (Jan. 22, 1999) ("[U]nder the Commission's rules, a winning bidder is obligated to pay the full amount of its winning bid . . .."). Accordingly, under this interpretation, the obligation was incurred, in the present case, on May 8, 1996. In *NextWave*, the Second Circuit afforded this interpretation considerable deference in ruling that NextWave's obligation arose at the close of the C-block auction, despite NextWave's contention that the FCC's status as a creditor and its self-interest precluded the court's deferring to the FCC's interpretation. *See In re NextWave*, 200 F.3d at 57 ("Our ruling is based on the FCC's interpretation of its own regulations, to which courts owe deference . . .."); *id*. at 59 ("The financial benefits of the FCC's post hoc interpretation do not extinguish the courts' duty to give deference.").

We respectfully disagree with the Second Circuit's conclusion that courts should defer to the FCC's interpretation in this matter. The FCC did not announce its interpretation until December 23, 1998–nearly two years after C-block licensees began experiencing financial difficulties and after the Debtors had filed bankruptcy petitions, brought an adversary proceeding against the FCC, and obtained a judgment in the

adversary proceeding on June 4, 1998.[33]  Moreover, in a separate

statement issued with the December 23, 1998 order, FCC Chairman William

Kennard wrote that "some of the[] issues [addressed in this order] only

emerge[d] as a result of the lessons learned during litigation." *In re*

*Applications for Assignment of Broadband Personal Communications Servs.*

*Licenses*, Statement of Chairman William Kennard, 14 F.C.C.R. 1126, 1998

WL 889489 (Dec. 23, 1998).  In fact, paragraph one of the December 23,

1998 order, which contains the interpretation the FCC argues that this

Court should defer to, states that the newly adopted procedures for

transferring licenses "was made in light of a recent bankruptcy court

decision and arguments raised in other pending bankruptcy proceedings."

*Id*. ¶ 1 (footnote omitted).  This bankruptcy decision and proceedings,

as noted in the margin of the order, were those of the lower courts in

this dispute between the Debtors and the FCC.  *See id.* ¶ 1 n.3

(containing the following citation: "*See, e.g., In re GWI PCS 1, Inc.,*

*et al.*, Case Nos. 39739676 through 39739689 (Bankr. N.D. Tex.); *GWI PCS*

*1, Inc. v. FCC*, Adv. No. 397-3492 (Bankr. N.D. Tex.) (appeal pending)").

In circumstances such as these, where an agency's interpretation occurs

at such a time and in such as manner as to provide a convenient

litigation position for the agency, we have declined to defer to the

interpretation. *See Waste Control Specialists v. United States Dept.*

---

[33] The present litigation was not the only one pending in December 1998 that raised the issue of avoidance; for example, NextWave filed its chapter 11 petition and instituted its adversary proceeding against the FCC on June 8, 1998.  *See In re NextWave*, 200 F.3d at 48.

*of Energy*, 141 F.3d 564, 567 (5th Cir. 1998) ("We will not give deference to [the Department of Energy]'s interpretation . . ., because it had not enunciated its interpretation prior to the litigation.") (footnote and citations omitted); *United States v. Food, 2,998 Cases*, 64 F.3d 984, 987 n.5 (5th Cir. 1995) ("Because it appears that the FDA interpreted § 334 and § 381 at such a time and in such a manner so as to provide a convenient litigation position for this suit, we disagree and conclude that the FDA's position is not controlling.") (citation omitted); *Irving Indep. Sch. Dist. v. Packard Properties*, 970 F.2d 58, 64 (5th Cir. 1992) ("Discounting the FDIC interpretation is appropriate for another important reason.  The FDIC's Legal Memorandum was issued during pending litigation."); *see also Bowen v. Georgetown Univ. Hosp.*, 109 S.Ct. 468, 474 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); *Nordell v. Heckler*, 749 F.2d 47, 48 (D.C. Cir. 1984) ("To carry much weight, however, the [agency] interpretation must be publicly articulated some time prior to the agency's embroilment in litigation over the disputed provision.").  Accordingly, we do not afford the FCC's December 1998 interpretation deference in determining the appropriate date on which the subsidiary debtors' and GWI PCS's obligation to the FCC arose.

We now consider the FCC's argument that auction law supports its position that the transfer must be evaluated at the date the C-block auction closed—May 8, 1996.  General principles of auction law provide

38

a baseline rule that the close of an auction-the fall of the hammer-signals acceptance of the offer and creates a binding contract between the seller and the high bidder. *See Blossom v. Railroad Co.*, 70 U.S. (3 Wall.) 196, 206 (1865) ("[A]s soon as the hammer is struck down . . . the bargain is considered as concluded, and the seller has no right afterwards to accept a higher bid nor the buyer to withdraw from the contract.") (footnote and citations omitted); *Lawrence Paper Co. v. Rosen & Co.*, 939 F.2d 376, 378-79 (6th Cir. 1991) ("'The contract becomes complete only when the bid is accepted, this being ordinarily denoted by the fall of a hammer.'") (quoting 7 AM. JUR. 2D *Auctions & Auctioneers* § 16 (1980 & Supp. 1991)); *Bottorff v. Ault*, 374 F.2d 832, 835 (7th Cir. 1967) ("The sales here were at auction. They were completed when the hammer fell or when the auctioneer said 'sold.'") (citation omitted); *United States v. Conrad*, 619 F. Supp. 1319, 1321 (M.D. Fla. 1985) ("It has long been settled that a bid constitutes an offer and the fall of the hammer signifies acceptance."). This postulate of auction law, however, merely provides a baseline, which, in the context of the FCC's auction of the electromagnetic spectrum, has been modified by the FCC's regulations. In *NextWave*, the Second Circuit agreed with the FCC's interpretation of the bidding regulations, concluding that at the close of a C-block auction a winning bidder "became obligated, if qualified, to pay the . . . bid price or, if unqualified, to pay a prescribed penalty." *In re NextWave*, 200 F.3d at 58. The Second Circuit then reasoned that, "[b]y making the high bid,

NextWave (a) assumed an obligation to pay a down-payment promptly, (b) assumed an obligation to pay in the future the amount of its bid upon receipt of the Licenses and (c) assumed the risk that it might prove unqualified, by binding itself in that event to pay the amount of any shortfall in a re-auction of the same Licenses." *Id*. at 61. Thus, the Second Circuit determined that NextWave became obligated to pay the FCC the full bid price at the close of the auction. We respectfully disagree with the Second Circuit's conclusion in this respect.

Neither the FCA nor FCC regulations states that the high bidder for a C-block license becomes obligated for the full amount of the bid at the close of the auction. Instead, 47 C.F.R. § 24.704 provides as follows:

> "(a) When the Commission conducts a simultaneous multiple round auction pursuant to § 24.702(a)(1), the Commission will impose penalties on bidders who withdraw high bids during the course of an auction, who default on payments due after an auction closes, or who are disqualified.
> (1) Bid withdrawal prior to close of auction. A bidder who withdraws a high bid during the course of an auction will be subject to a penalty equal to the difference between the amount bid and the amount of the winning bid the next time the license is offered by the Commission. No withdrawal penalty would be assessed if the subsequent winning bid exceeds the withdrawn bid. This penalty amount will be deducted from any upfront payments or down payments that the withdrawing bidder was [sic] deposited with the Commission.
> (2) Default or disqualification after close of auction. If a high bidder defaults or is disqualified after the close of such an auction, the defaulting bidder will be subject to the penalty in paragraph (a)(1) of this section plus an additional penalty equal to three (3) percent of the subsequent winning bid. If the subsequent winning bid exceeds the defaulting bidder's bid amount, the 3 percent penalty will be calculated based on the defaulting bidder's bid amount. These amounts will be deducted from any upfront payments or down payments that the defaulting or disqualified

40

bidder has deposited with the Commission." 47 C.F.R. § 24.704(a) (1995).[34]

This penalty provision does not obligate the winning bidder to pay the full amount of the bid. Accordingly, by making the winning bids on the fourteen licenses, GWI PCS only obligated itself to pay a penalty in the event of default or disqualification, not the full amount of the winning bids.[35] There has been no default respecting the fourteen licenses for

_____

[34] This regulation governing the auction of the electromagnetic spectrum comports with the FCC's general competitive bidding procedures contained in 47 C.F.R. §§ 1.2104(g) & 1.2109(c) (1995).

[35] The FCC's treatment of a defaulting entity further supports this conclusion. *See In re BDPCS, Inc.*, 11 F.C.C.R. 14,399, 1996 WL 625565 (Oct. 25, 1996). BDPCS was a high bidder for seventeen C-block licenses, but "fail[ed] to remit the required down payment on the licenses for which it was the successful high bidder." *Id*. ¶ 1. On May 30, 1996, the FCC publicly announced that BDPCS had defaulted on the seventeen licenses and that these licenses would be reauctioned in July 1996. *See id*. ¶ 4. With regard to BDPCS's obligation to the FCC, the October 25, 1996 order states as follows:

"A defaulting bidder is subject to certain default payment obligations. Specifically, such bidder is required to pay the difference between the amount bid and the amount of the winning bid the next time the license is offered by the Commission (so long as the subsequent winning bid is less than the amount bid), plus an additional payment equal to three percent of the defaulter's bid or the subsequent winning bid, whichever is less. In the event that a license is reauctioned for amount greater than or equal to the defaulted bid, the total default payment is equal to three percent of the defaulted bid. In the event that the default payment cannot be determined (i.e, because a license has not yet been reauctioned), the Commission has indicated that a deposit may be assessed of up to 20 percent of the defaulted bid price. Finally, the Commission's payment rules provide that if a defaulting bidder does not submit the default payment assessed by the Commission in the time required, any amounts overdue 'will be deducted from any upfront payments or down payments that the defaulting or disqualified bidder has deposited with the Commission." *Id*. ¶ 5 (footnotes omitted).

41

which GWI PCS was the high bidder. No penalty therefore has been assessed or can be calculated.[36]

After the close of the auction on May 8, 1996, GWI PCS was merely entitled to apply for the licenses. To be sure, GWI PCS held a contingent right to the fourteen licenses; however, the FCC's January 27, 1997 order makes clear that the transfer of the licenses was not complete until the execution of the notes and the payment of the remaining portion of the down-payment. *See Wireless Telecommunications Bureau Announces Grant of Broadband Personal Communications Services Entrepreneurs' C Block Licenses to GWI PCS Inc.*, 12 F.C.C.R. 1215, 1997 WL 28957 (Jan. 27, 1997) ("GWI PCS will receive its individual BTA licenses following payment for each license of the final down payment and execution and return of the note and security agreement."); *id.* ("[T]he Bureau . . . granted GWI PCS's applications, conditioned on timely payment of its remaining down payment obligation.").[37] GWI PCS's applications remained subject to objection by the public (and in fact were objected to) and could have been rejected by the FCC–a decision affording the FCC some level of discretion. *See* 47 C.F.R. § 24.832(a)

_____

Notably, this order does not state that BDPCS is, or was ever, obligated to the FCC for the full amount of its bid price.

[36]In fact, the subsidiary debtors assert that, since the bankruptcy court confirmed the reorganization plan, they have made over $9 million in installment payments to the FCC under the modified obligation to the FCC–a contention the FCC does not dispute.

[37] In addition, interest on the bid amount did not begin to accrue until the conditional granting of the licenses. *See* 47 C.F.R. § 24.711(b)(1) (1995); 47 C.F.R. § 1.2110(e)(3)(i) (1995).

(1995) ("Applications for an instrument of authorization will be granted if, upon examination of the application and upon consideration of such other matters as it may officially notice, *the Commission finds that the grant will serve the public interest, convenience and necessity.*") (emphasis added); 47 C.F.R. § 24.804(a) (1995) ("Authorizations will be granted upon proper application if: (1) The applicant is qualified under all applicable laws and Commission regulations, policies and decisions; (2) There are frequencies available to provide satisfactory service; and (3) *The public interest, convenience or necessity would be served by a grant.*") (emphasis added); *see also* 47 C.F.R. § 1.2108(d)(1) (1995) ("If the Commission determines that: (1) an applicant is qualified and there is no substantial and material issue of fact concerning that determination, it will grant the application."); *In re Implementation of Section 309(j) of the Communications Act–Competitive Bidding, Fifth Report and Order*, 9 F.C.C.R. 5532 ¶ 81, 1994 WL 372170 (July 15, 1994) ("If the Commission denies all petitions to deny, and is otherwise satisfied that the applicant is qualified, the license(s) will be granted to the auction winner.").[38] In addition, it is undisputed that

---

[38] The FCC also has the authority to amend the terms for awarding a license after an application for the license has been filed. *See PLMRS Narrowband Corp v. FCC*, 182 F.3d 995, 1000-01 (D.C. Cir. 1999) (concluding that the FCC's decision to auction licenses and return all pending applications, which had been submitted when the licenses were awarded by a lottery system, was not arbitrary and capricious); *Mobile Communications Corp. of Am. v. FCC*, 77 F.3d 1399, 1402-03 (D.C. Cir. 1995) (upholding the FCC's authority to impose a payment requirement for a license, where the potential licensee applied for the license before the FCC required any payment).

while the applications were pending, GWI PCS could not and did not use the licenses. *See* 47 C.F.R. § 24.803 (1995) ("No person shall use or operate any device for the transmission of energy or communications by radio in the services authorized by this part except as provided in this part."). Only after the applications were approved and the promissory notes had been signed, could the fruits of the licenses be utilized.[39]

---

[39] The FCC regulations, however, do provide for the temporary use of a license with FCC permission. 47 C.F.R. § 24.825 provides as follows:

"(a) In circumstances requiring immediate or temporary use of facilities, request may be made for special temporary authority to install and/or operate new or modified equipment. Any such request may be submitted as an informal application in the manner set forth in § 24.805 and must contain full particulars as to the proposed operation including all facts sufficient to justify the temporary authority sought and the public interest therein. No such request will be considered unless the request is received by the Commission at least 10 days prior to the date of proposed construction or operation or, where an extension is sought, at least 10 days prior to the expiration date of the existing temporary authorization. The Commission may accept a late-filed request upon due showing of sufficient reasons for the delay in submitting such request.

(b) Special temporary authorizations may be granted without regard to the 30- day public notice requirements of § 24.827(b) when:

(1) The authorization is for a period not to exceed 30 days and no application for regular operation is contemplated to be filed;

(2) The authorization is for a period not to exceed 60 days pending the filing of an application for such regular operation;

(3) The authorization is to permit interim operation to facilitate completion of authorized construction or to provide substantially the same service as previously authorized; or

(4) The authorization is made upon a finding that there are extraordinary circumstances requiring operation in the public interest and that delay in the institution of such service would seriously prejudice

44

Accordingly, the C-block auction was not a typical auction. Under the C-block auction rules, the winning bidder is not entitled to the license until after receiving subsequent FCC approval and does not become obligated for the full bid price until the notes securing the full bid price are thereafter signed.

The transfer of subsidiary debtors' fourteen licenses and the concurrent obligation to pay the remaining bid price, $954 million, did not arise until the subsidiary debtors executed the promissory notes for the remainder of the bid price on January 27, 1996. *See In re Southmark*

---

the public interest.
(c) Temporary authorizations of operation not to exceed 180 days may be granted under the standards of Section 309(f) of the Communications Act where extraordinary circumstances so require. Extensions of the temporary authorization for a period of 180 days each may also be granted, but the applicant bears a heavy burden to show that extraordinary circumstances warrant such an extension.
(d) In cases of emergency found by the Commission, involving danger to life or property or due to damage of equipment, or during a national emergency proclaimed by the president or declared by the Congress or during the continuance of any war in which the United States is engaged and when such action is necessary for the national defense or safety or otherwise in furtherance of the war effort, or in cases of emergency where the Commission finds that it would not be feasible to secure renewal applications from existing licensees or otherwise to follow normal licensing procedure, the Commission will grant radio station authorizations and station licenses, or modifications or renewals thereof, during the emergency found by the Commission or during the continuance of any such national emergency or war, as special temporary licenses, only for the period of emergency or war requiring such action, without the filing of formal applications." 47 C.F.R. § 24.825 (1995).
We hold that the possibility of an FCC temporary grant of use of the license does not render the grant of a license to a high bidder unconditional.

*Corp.*, 62 F.3d at 106 ("A debtor incurs a debt when he becomes legally obligated to pay it.") (citing *Sherman v. First City Bank (In re United Sciences of Am.)*, 893 F.2d 720, 724 (5th Cir. 1990); *In re Emerald Oil Co.*, 695 F.2d 833, 837 (5th Cir. 1983)). Therefore, we conclude that the bankruptcy court properly determined January 27, 1997 as the appropriate date to evaluate the avoidance motion. With respect to this issue, the FCC's challenge fails, and we affirm the avoidance of the approximately $894 million of the obligation of the subsidiary debtors (and of any such obligation of GWI PCS) to the FCC.

## Conclusion

For the reasons stated, the judgment of the district court is AFFIRMED.