**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 3, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re:

STEVE ZIMMER PAIGE,

    Debtor.

————————————————————

SEARCH MARKET DIRECT, INC.,
and MAGNET MEDIA, INC.,

    Appellants,

v.

GARY E. JUBBER, Trustee of the
Bankruptcy Estate of Stephen Zimmer
Paige, and CONSUMERINFO.COM,

    Appellees.

No. 08-4104

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:07-CV-00822-TS)**

---

Adam S. Affleck (Michael N. Zundel, James A. Boevers, Andrew B. Clawson, and Erin M. Stone with him on the briefs) of Prince, Yeates & Geldzahler, P.C., Salt Lake City, Utah, for Appellants.

Peter W. Billings of Fabian & Clendenin, P.C., Salt Lake City, Utah (Gary E. Jubber and Douglas J. Payne of Fabian & Clendenin, P.C., Salt Lake City, Utah, Robert E. Richards of Sonnenschein, Nath & Rosenthal, LLP, Chicago, Illinois, and Michael R. Johnson of Snell and Wilmer, LLP, Salt Lake City, Utah, with him on the brief) for Appellees.

Before **TACHA, EBEL,** and **LUCERO**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Appellants Search Market Direct, Inc. and Magnet Media, Inc. (collectively "SMDI") seek to appeal the bankruptcy court's decision confirming Appellees' joint bankruptcy reorganization plan (the "Joint Plan") and denying SMDI's competing plan. Following the bankruptcy court's confirmation of the Joint Plan, the trustee paid off most of the bankruptcy estate's creditors and the plan was substantially consummated. In light of the steps that had been taken to implement the Joint Plan, the district court dismissed SMDI's appeal, concluding that it had become both constitutionally and equitably moot. Exercising our jurisdiction pursuant to 28 U.S.C. § 158(d)(1), we REVERSE and REMAND this case to the district court for consideration of the merits of SMDI's appeal.

This case presents a somewhat unsettling—but we suspect common—set of facts. Two competing parties—ConsumerInfo.Com ("ConsumerInfo") and SMDI—have proposed plans to administer Mr. Paige's bankruptcy estate. However, while both of these plans were crafted to be protective of the creditors' interests, neither of these parties is really interested in ensuring that the creditors are paid off. Rather, as the bankruptcy court observed, "the proponents' true

2

intentions throughout this case ha[ve] been to acquire the right to own and use the [FreeCreditScore.com] Domain Name," In re Paige, No. 05-34474, 2007 WL 4143212, at *7 (Bankr. D. Utah 2007), the estate's most valuable asset. To that end, both ConsumerInfo and SMDI purchased substantial portions of the creditors' claims against the estate, thereby gaining the authority to propose bankruptcy plans for the estate that would further their respective desires to acquire the FreeCreditScore.com domain name.

At some point in these proceedings, it became clear that both ConsumerInfo and SMDI were willing to pay a lot of money for the domain name; far more than the aggregate amount of all the estate's debts and expenses. However, they would each like to pay as little as necessary to acquire the domain name and, in that regard, have used these bankruptcy proceedings to avoid standard asset-purchase procedures.

Although we are not particularly sympathetic to SMDI's request to prolong an already complex bankruptcy case, we conclude that SMDI's appeal is not constitutionally or equitably moot, and remand this case to the district court for consideration of the merits of SMDI's appeal.

We also take this opportunity to clarify this circuit's law on mootness in bankruptcy proceedings. First, we clarify that an appeal of a bankruptcy court's decision will only be constitutionally moot if the appellee demonstrates that a court could order no meaningful relief to the party seeking reversal of the

3

bankruptcy court's decision.  Second, we formally adopt the doctrine commonly known as "equitable mootness," pursuant to which a court will avoid deciding the merits of a bankruptcy appeal even though the appeal is not constitutionally moot.[1]  We also clarify the factors that a court must consider before deciding to avoid reaching the merits of a bankruptcy appeal under the doctrine of equitable mootness.  Finally, we stress that these doctrines are limited in their scope and the party that wishes the court not to decide the merits of an appeal bears the burden of proof.

## I.  Background

Steve Zimmer Paige filed for bankruptcy under Chapter 7 in September 2005.  The case was subsequently converted into a Chapter 11 proceeding, and Gary Jubber was appointed as the Chapter 11 trustee for the estate.[2]  Mr. Jubber was thereafter informed by an "anonymous tipster" that the estate might own a

---

[1]Equitable mootness is really a misnomer because the basis of a dismissal under equitable mootness is not so much that a claim has truly become moot as it is that a weighing of the equities—and particularly the interests of innocent parties—suggests that the more equitable approach is for the court to decline to hear a challenge to the plan.  Perhaps the doctrine more correctly should be called equitable avoidance or equitable bar.  However, because this doctrine is uniformly referred to as the doctrine of equitable mootness, we will continue to use that designation as well.

[2] Mr. Jubber was actually initially appointed as the Chapter 7 trustee.  However, after filing under Chapter 7, the debtor requested that the court convert his Chapter 7 filing into a Chapter 11 filing, and the bankruptcy court granted that motion.  Mr. Jubber subsequently moved to convert the case back to Chapter 7, but the bankruptcy court denied that motion.  However, the court subsequently granted Mr. Jubber's motion to become the Chapter 11 trustee.

significant interest in a very valuable asset: the internet domain name "FreeCreditScore.com."

The debtor, Steve Paige, registered the "FreeCreditScore.com" domain name on or about May 2000, more than five years before declaring bankruptcy. At some contested point in time (either before or after declaring bankruptcy) Mr. Paige sold this domain name to a third party. The third party then sold that domain name to SMDI for $350,000.[3]

After learning that the estate may have an interest in the domain name, Mr. Jubber initiated an adversary proceeding ("AP) against a number of entities and individuals, alleging that Mr. Paige had wrongfully conveyed his interest in the domain name to them, and that any such transfer should be declared void. As the most recent purchasers of the domain name, SMDI is the primary defendant in the AP. Stephen May, who owns 100% of SMDI also purchased the debtor's "residual interest" in the domain name after the debtor filed for bankruptcy. That AP before the bankruptcy court is ongoing.

---

[3] The current value of the domain name is, however, substantially higher. Mr. Balducci, a ConsumerInfo executive, testified that ConsumerInfo would be willing to pay $5 million for the FreeCreditScore.com domain name. Mr. May, the CEO of Search Market, testified before the bankruptcy court that the domain name is worth $25 million. The bankruptcy court generally agreed that the domain name was worth far more than SMDI initially paid for it, noting that the domain name "could be very valuable in the possession of either ConsumerInfo or SMDI." In re Paige, 2007 WL 4143212, at *7. However, the precise value of the domain name is not currently known in part because "SMDI is presently using the Domain Name and has rejected Trustee's or ConsumerInfo's attempts to obtain discovery of the amount of Domain Name's use or revenues from such use." Id.

While the AP was proceeding, Mr. Jubber requested permission from the bankruptcy court to sell the estate's interest in the domain name, although the ultimate value of the estate's interest is largely dependent on the outcome of the AP.[4] Over SMDI's objections, the bankruptcy court approved Mr. Jubber's motion to sell most of the estate's interest in the outcome of the AP to ConsumerInfo and approved the parties' Asset Purchase Agreement ("APA"). The APA provided, inter alia, that Mr. Jubber would "reasonably consult with [ConsumerInfo] regarding prosecution of the [Adversary Proceeding]." (Appx. at 317.) The APA further provided that Mr. Jubber "in his reasonable business discretion can settle or otherwise compromise the [AP] . . . but will consult with [ConsumerInfo] first before entering into any settlement [of the AP,] and any such settlement will be subject to Bankruptcy Court approval and the opportunity of [ConsumerInfo] to object or to overbid . . . ." (Id.) The APA continued to explain that, if Mr. Jubber receives court approval for a settlement of the AP that is not approved by ConsumerInfo, then the estate must refund $1,825,000 to ConsumerInfo. In exchange for most of the estate's interests in the domain name, ConsumerInfo agreed, inter alia, to give the trustee money to pay most of the outstanding claims against the estate. The court approved Mr. Jubber's proposed

---

[4] Before a trustee attempts to sell an estate's primary assets, he must convince the bankruptcy court, inter alia, of the soundness of his decision to sell. See generally 11 U.S.C. § 363(b); In re Med. Software Solutions, 286 B.R. 431, 439-40 (Bankr. D. Utah 2002).

APA in part because it determined that the sale of those assets would not affect the trustee's ability "to determine strategy throughout the litigation," and "the Trustee will [still] have the sole discretion to settle the adversary proceeding." (Id. at 393.)

A.    The Competing Plans

In addition to purchasing the estate's interest in the outcome of the AP, ConsumerInfo also purchased CCB Data Corporation's rights to bring claims against the estate to seek compensation for its efforts in developing the domain name, thereby acquiring the authority to propose a reorganization plan. See In re Paige, 2007 WL 4143212, at *4.

The trustee liked ConsumerInfo's plan and, together, they filed a Joint Plan with the bankruptcy court. Under the Joint Plan, the estate would use the $1.9 million it received from the sale of its interest in the AP to ConsumerInfo in order to pay its creditors, and ConsumerInfo agreed to provide an additional $300,000 "contingent payment" if needed to cover certain additional claims. Further, ConsumerInfo agreed that the right to prosecute the AP and other actions would vest in a liquidating trust, headed by Mr. Jubber, and that ConsumerInfo would fund its litigation costs.

Like ConsumerInfo, SMDI also purchased some creditors' claims, enabling it to propose a competing plan. See id. at *2. SMDI capitalized on that authority and proposed a competing Chapter 11 reorganization plan for Mr. Paige's estate.

7

SMDI's plan, like the Joint Plan, proposes to pay off all of the estate's administrative expenses as well as all allowed claims. In exchange for SMDI's payment of the estate's debts, the estate would promise to dismiss the AP with prejudice, thereby leaving SMDI with total—or nearly total—ownership of the domain name. The confirmation of SMDI's plan is conditional on SMDI depositing money sufficient to cover those expenses into an account.[5] In its filings before the bankruptcy court, SMDI estimated those expenses, less cash assets in the estate, at $2,600,000. Before the bankruptcy court hearing on the competing plans, SMDI demonstrated its ability to cover those costs by setting aside that amount in an account. See id. at *6.

B.      The Bankruptcy Court's Decision

The bankruptcy court held a seven-day trial where it thoroughly considered the merits of the competing plans. See id. at *1. The bankruptcy court rejected SMDI's plan and confirmed the Joint Plan. The court found that SMDI's plan did not comply with 11 U.S.C. § 1129(a)(1) because it placed ConsumerInfo into a separate class than other similarly situated creditors. In re Paige, 2007 WL 4143212, at *10. The court acknowledged, however, "that this might make little difference here because SMDI's plan purports to pay all creditors . . . ." Id. Further, the bankruptcy court ruled that SMDI's plan violated 11 U.S.C.

_____

[5] This type of provision was unnecessary for ConsumerInfo, which is a much larger company than SMDI.

§ 1129(a)(3), which requires that a plan be proposed in "good faith." Specifically, the court found that SMDI's plan inappropriately compelled the settlement of the AP. In re Paige, 2007 WL 4143212 at *14-*15. The court determined that the compelled settlement was inappropriate because the trustee, not the creditors, must move for approval of a settlement, id. at *15, that even if SMDI could propose a settlement, SMDI had failed to show the court that a settlement should be approved, id., and that this compelled settlement "could easily be construed as a breach of Trustee's duties" to ConsumerInfo under the APA, id. at *16. The court further held that SMDI had failed properly to appeal the approval of the APA and, even if its challenge to the confirmation of the Joint Plan could be construed as a challenge to the sale under the APA, SMDI had failed to prove "that the sale was approved by mistake or inadvertence, or that the Sale Order lacked adequate evidentiary basis." Id. at *17.

The bankruptcy court rejected SMDI's claims that the Joint Plan should not be confirmed because, inter alia, the debtor had engaged in inappropriate negotiations with ConsumerInfo. The court concluded that "engaging in these communications, albeit possibly improper under ethical rules, does not translate into filing of a plan by 'means forbidden by law' and not in 'good faith' . . ." Id. at *13.

C.    Post-Confirmation Events

SMDI appealed both of those decisions to the district court. On the merits,

9

SMDI argued that the bankruptcy court's reasons for finding fault with SMDI's plan were in error; that ConsumerInfo had engaged in unethical communications with the debtor, which led to its paying the debtor $20,000 and convincing him to abandon his support for SMDI's plan; that the trustee was not "disinterested" in his dealings with ConsumerInfo; that the trustee's interest in the disposition of the estate's assets inappropriately influenced his dealings in this case[6]; that the Joint Plan should not have been confirmed because it wrongly denied payment to SMDI on SMDI's claims against the estate; and that certain aspects of the Joint Plan were not "fair and equitable" to SMDI. While that appeal was pending, however, some significant post-confirmation events took place which substantially changed the posture of SMDI's appeal.

Under the Joint Plan, the Plan was to become effective only after, inter alia, any pending appeals were resolved. However, the Joint Plan also enabled Mr. Jubber and ConsumerInfo to waive those requirements. They in fact waived those requirements in October 2007, thus paving the way for the Plan to be substantially consummated despite SMDI's pending appeal. And, once the Joint Plan became effective, the trustee took substantial steps to pay creditors, object to creditors' claims, and prosecute the AP. In turn, ConsumerInfo made significant payments

---

[6] Perhaps most importantly, SMDI argued "it is beyond question that the Trustee cannot loyally represent ConsumerInfo's interest in the Adversary Proceeding and, at the same time, vigorously represent the estate's interest against ConsumerInfo in its capacity as the holder of the largest adverse claim against the estate." (Appx. at 190-91.)

10

to the trustee to cover the estate's administrative costs and creditors' claims.

SMDI feared that the parties would try to implement the Joint Plan while SMDI's appeal was pending, and sought to prevent that by requesting a stay of the Plan pending their appeal. The bankruptcy court denied SMDI's request to stay confirmation of the Joint Plan in part because the bankruptcy court concluded, "on a preliminary basis," that SMDI's appeal would not be rendered moot once the creditors were paid under the Joint Plan since "there is a possibility that SMDI could use its $2.6 million that it set aside to fund the repayment to ConsumerInfo." (Appx. at 1060.) SMDI then sought a stay from the district court arguing, inter alia, that the court should grant a stay because "there is a high probability that, without a stay, the Joint Plan will be substantially consummated during the pendency of SMDI's appeal and render it moot." (Aple. Supp. Appx. at 82.) Nonetheless, the district court denied SMDI's request for a stay. SMDI did not appeal that decision to this court.

D.    The District Court's Dismissal of SMDI's Appeal

Despite their failure to obtain a stay pending appeal, SMDI appealed the bankruptcy court's decision confirming the Joint Plan and rejecting SMDI's plan to the district court. ConsumerInfo and Mr. Jubber jointly moved to dismiss the appeal for mootness, arguing that the district court could not "grant [SMDI] any effective relief in this appeal and, even if it could, such relief would be inequitable." (Appx. at 840.) Before the district court, Appellees' counsel

11

argued, inter alia, that the case was moot because the trustee had taken many steps to effectuate the Joint Plan that could not be undone; in his words, "the eggs can't be unscrambled." (Id. at 1196.) The district court dismissed the appeal, finding that, in light of the steps taken to implement the Joint Plan, SMDI's appeal had become both constitutionally and equitably moot. This timely appeal followed.

## II. Analysis

### A. Standard of Review

Our review of the district court's determination that the appeal before the district court was constitutionally moot is de novo. See Boullioun Aircraft Holding Co. v. Smith Mgmt. (In re W. Pac. Airlines, Inc.), 181 F.3d 1191, 1194 (10th Cir. 1999) (reviewing finding of constitutional mootness de novo); Dais-Naid, Inc. v. Phoenix Res. Cos. (In re Texas Int'l Corp.), 974 F.2d 1246, 1247 (10th Cir.1992) (per curiam) (same). Similarly, "[w]e interpret the terms of [the] reorganization plan[s] de novo as a question of law." In re Texas Int'l, 974 F.2d at 1247.

Although courts generally agree that a court of appeals reviews a district court's factual findings relating to a determination of equitable mootness for clear error, see, e.g., United States v. In re GWI PCS 1 Inc. (In re GWI PCS 1 Inc.), 230 F.3d 788, 799 (5th Cir. 2000), courts are split over whether a district court's ultimate determination of equitable mootness should be reviewed de novo or for

12

abuse of discretion. Compare Curreys of Neb., Inc. v. United Producers, Inc. (In re United Producers, Inc.), 526 F.3d 942, 946-47 (6th Cir. 2008) (reviewing determination of equitable mootness de novo), and Liquidity Solutions, Inc. v. Winn-Dixie Stores, Inc. (In re Winn-Dixie Store, Inc.), 286 Fed. Appx. 619, 622 & n.2 (11th Cir. Jul 1, 2008) (unpublished) (same), and In re GWI, 230 F.3d at 799-800 (same), with Nordhoff Invs., Inc. v. Zenith Elec. Corp., 258 F.3d 180, 182 (3rd Cir. 2001) (stating that "'[b]ecause the mootness determination we review here involves a discretionary balancing of equitable and prudential factors rather than the limits of the federal court[s'] authority under Article III, using ordinary review principles we review that decision generally for abuse of discretion'") (quoting In re Continental Airlines, 91 F.3d 553, 560 (3rd Cir. 1996) (en banc)).

This disagreement is likely based on the unique role of the district courts in the bankruptcy context: On the one hand, district courts act as appeals courts and their decisions should, therefore, be based on legal determinations which this court would generally review de novo. See In re United Producers, 526 F.3d at 946 (holding that court reviews a finding of equitable mootness de novo, in part "because the court of appeals is 'in just as good a position to make this determination as was the district court'") (quoting In re Continental Airlines, 91 F.3d at 568 n.4 (Alito, J., dissenting)). On the other hand, a determination of equitable mootness is discretionary, see In re AOV Indus., Inc., 792 F.2d 1140,

13

1148 (D.C. Cir. 1986) (discussing the district court's "discretionary power to dismiss an appeal on [equitable] mootness grounds"), and, therefore, a district court's finding of equitable mootness may warrant some measure of deference. This circuit has yet to rule on this issue but, in the similar context of prudential mootness,[7] we have reviewed the district court's findings for an abuse of discretion. See Fletcher v. United States, 116 F.3d 1315, 1321 (10th Cir. 1997) ("Because the doctrine of prudential mootness is concerned with the court's discretion to exercise its power to provide relief . . . , we review the district court's determination of prudential mootness for an abuse of discretion.") (citation omitted). Given the similarities between these doctrines, we adopt the abuse-of-discretion standard of review for determinations of equitable mootness in bankruptcy cases.

---

[7] As we discuss in greater detail below, the doctrine of equitable mootness is rooted, at least in part, in the court's discretionary power to fashion a remedy in cases seeking equitable relief. Like equitable mootness, prudential mootness arises "from doctrines of remedial discretion." S. Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727 (10th Cir. 1997). In both these doctrines, courts have developed guidelines that dictate circumstances where—although the court may have the authority to fashion some sort of remedy—equitable, prudential, or pragmatic concerns will stay the court's hand. In the context of prudential mootness, which typically involves a party seeking "an injunction against the government," courts will stay their hand for reasons involving "comity for coordinate branches of government." Id. Equitable mootness, on the other hand, which typically involves an appeal of a bankruptcy court's decision, "deals with parties' reliance upon a substantially consummated plan of reorganization and the point at which modification of that plan would unduly impact innocent third parties." Metro. Life Ins. Co. v. Milk Palace Dairy, LLC (In re Milk Palace Dairy, LLC), 327 B.R. 462, 467 (10th Cir. B.A.P. 2005).

To the extent that this appeal also raises issues decided by the bankruptcy court, "[o]ur review of the bankruptcy court's decision is governed by the same standards of review that govern the district court's review of the bankruptcy court. Accordingly we review the bankruptcy court's legal determinations de novo and its factual findings under the clearly erroneous standard." Morris v. Hicks (In re Hicks), 491 F.3d 1136, 1139 (10th Cir. 2007) (citation omitted).

B.     SMDI's Appeal is not Constitutionally Moot

"An appeal is [constitutionally] moot if the court can fashion no meaningful relief . . . .  At the same time, if a court can fashion some form of meaningful relief, even if it only partially redresses the grievances of the prevailing party, the appeal is not moot." In re W. Pac. Airlines, 181 F.3d at 1195 (quotations and alterations omitted).  "A party claiming that there is no longer a live case or controversy bears the burden of demonstrating mootness." Kan. Judicial Review v. Stout, 562 F.3d 1240, 1245 (10th Cir. 2009); see also Suter v. Goedert, 504 F.3d 982, 986 (9th Cir. 2007) ("[T]he burden of establishing mootness is on the party advocating its application.").

In this case, Appellees have not carried their burden of proving that there is no relief the court could order.  Appellees argue that this appeal is constitutionally moot because SMDI lacks sufficient funds to implement their plan and, therefore, if SMDI prevailed on appeal, the court would need to order disgorgement of payments already made to third parties—disgorgement that,

15

Appellees argue, the court lacks the authority to order. Even assuming Appellees are correct that the district court lacked the authority to order disgorgement of payments made to creditors under the Joint Plan (a proposition that we do not rule upon), Appellees offer no proof that confirmation of SMDI's plan would necessarily lead to disgorgement of those payments. On the contrary, Appellees merely note that SMDI has failed to prove that they could fund their plan and, therefore, that the SMDI plan could be confirmed without requiring disgorgement of payments made to third-party creditors. Appellees invite this court to shift the burden onto SMDI to prove that the case is not moot because SMDI has the funds necessary to implement their plan. We decline that invitation, and conclude that Appellees have failed to prove that this appeal is constitutionally moot. See Suter, 504 F.3d at 988 (stating that district court erred in holding that appeal was moot because the appellants failed to "demonstrate what relief, if any, this court can grant," because the district court had erroneously "shifted the burden to the [appellants] to demonstrate non-mootness") (quotation omitted); Riverview Trenton R.R. v. DSC, Ltd. (In re DSC, Ltd.), 486 F.3d 940, 945-46 (6th Cir. 2007) (holding that appeal was not moot because the appellees failed adequately to support their allegation that "creditors may be prejudiced by the failure to obtain a stay of the dismissal order," and, therefore, the appellees had failed to "show that [the appellants] will not be able to obtain any effective relief if this court reverses the bankruptcy court's dismissal of the involuntary bankruptcy

16

petition").

Further, even if Appellees could prove that SMDI lacks sufficient funds to implement their plan without requiring disgorgement of payments made to third-party creditors, and that such disgorgement is outside the court's authority, that would still not convince us that this appeal was constitutionally moot. SMDI has not only asked this court to confirm their plan, but also to deny confirmation of the Joint Plan. Therefore, even if SMDI's lack of funds would prevent the district court from confirming SMDI's plan, the court could still reverse confirmation of the Joint Plan and that means there is still a live controversy and this case is not moot. Reversal of the Joint Plan would enable SMDI not only to seek approval of its competing plan, but also to propose a new plan, or, at the very least, to prevent ConsumerInfo, their competitor, from acquiring full ownership of the domain name. The possibility that reversal of the Joint Plan could provide benefits to SMDI means that their appeal is not constitutionally moot. See Osborn v. Durant Bank & Trust Co. (In re Osborn), 24 F.3d 1199, 1203 (10th Cir. 1994) (holding that appeal was not constitutionally moot "because it is not impossible for the court to grant some measure of effective relief" even though the court could not grant all the relief sought); Sw. Bell Tel. Co. v. Long Shot Drilling, Inc. (In re Long Shot Drilling, Inc.), 224 B.R. 473, 478 (10th Cir. B.A.P. 1998) (stating that if "there is a possibility of recovery to which an appellant might be entitled or some measure of effective relief that can be

17

fashioned, then the appeal is not [constitutionally] moot") (emphasis added).

C.      SMDI's Appeal is not Equitably Moot

        1.  *The Equitable Mootness Doctrine*

Although the Tenth Circuit has previously applied principles of equitable

mootness, it has not explicitly adopted the doctrine by name.  We now make

explicit what may previously have been implicit, and we adopt the equitable

mootness doctrine.[8]  Every other circuit to consider the issue has found that

"equitable," "prudential," or "pragmatic" considerations can render an appeal of a

bankruptcy court decision moot even when the appeal is not constitutionally

moot.  See, e.g., Rochman v. Ne. Utils. Serv. Group (In re Pub. Serv. Co. of

N. Hamp.), 963 F.2d 469, 473 (1st Cir. 1992) (stating that an appeal of a

bankruptcy court's decision "is moot if the requested relief would be either

inequitable or impracticable" to grant) (footnote omitted); In re Chateaugay, 988

F.2d at 325 ("An appeal should also be dismissed as moot when, even though

---

[8] This court in Fletcher cited with approval the Second Circuit's decision in Official Committee of Unsecured Creditors of LTV Aerospace and Defense Co. v. Official Committee of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.), 988 F.2d 322 (2d Cir. 1993), in support of the notion that a bankruptcy appeal may be rendered moot where "it would be inequitable to grant the requested relief because [the defendants] did not seek mandamus or take an interlocutory appeal." Fletcher, 116 F.3d at 1322 (citation omitted).  However, the court in Fletcher concluded that the appellant had sought to assert its rights at every opportunity it had and thus its appeal would not be barred by equitable mootness even if the doctrine was applied.  See id.  Thus, although this court has never explicitly adopted the equitable mootness doctrine, it has applied those principles.

18

effective relief could conceivably be fashioned, implementation of that relief would be inequitable."); In re Continental Airlines, 91 F.3d at 559 (explicitly adopting the "equitable mootness" doctrine although noting that "[i]t is evident that 'equitable mootness' is an inapt description of the doctrine at issue here"); Mac Panel Co. v. Virginia Panel Corp., 283 F.3d 622, 625 (4th Cir. 2002) (discussing the factors that go into a determination of equitable mootness); Manges v. Seattle-First Nat'l Bank (In re Manges), 29 F.3d 1034, 1038-39 (5th Cir. 1994) (recognizing that in the bankruptcy context there is a form of "'mootness' [that] is not an Article III inquiry as to whether a live controversy is presented; rather, it is a recognition by the appellate courts that there is a point beyond which they cannot order fundamental changes in reorganization actions"); In re United Producers, 526 F.3d at 946 (6th Cir.) (applying the equitable mootness doctrine); In re UNR Indus., Inc., 20 F.3d 766, 769 (7th Cir. 1994) (adopting the substance of the equitable mootness doctrine but banishing the term "'equitable mootness' from the (local) lexicon"); Briggs v. LaBarge (In re Smith), 209 Fed. Appx. 607, 607 (8th Cir. Dec. 14, 2006) (unpublished) (per curiam) (affirming district court's decision that bankruptcy appeal was moot because awarding the requested relief "would have been inequitable and impracticable at that time"); Trone v. Roberts Farm, Inc. (In re Roberts Farms, Inc.), 652 F.2d 793, 798 (9th Cir. 1981) (noting that "[a]n entirely separate and independent ground for dismissal has also been established because Appellants have failed and

neglected diligently to pursue their available remedies to obtain a stay of the objectionable orders of the Bankruptcy Court and have permitted such a comprehensive change of circumstances to occur as to render it inequitable for this court to consider the merits of the appeal"); Rotella & Assocs., P.A. v. East Coast Beverage Corp. (In re East Coast Beverage Corp.), 143 Fed. Appx. 259, 260 (11th Cir. Aug. 30, 2005) (unpublished) (per curiam) (holding that appeal was equitably moot because of the appellant's "failure to seek a stay, the numerous transactions effectuated under that plan's provisions," and the fact that the plan had been substantially consummated); In re AOV, 792 F.2d at 1148 (D.C. Cir.) (discussing the district court's "discretionary power to dismiss an appeal on [equitable] mootness grounds").

Similarly, a Tenth Circuit Bankruptcy Appeals Panel has explicitly adopted this concept, holding that

> if we can fashion effective relief for [the appellant] and this appeal passes the constitutional mootness test, we must still determine if ordering such relief would be equitable because this appeal arises in the context of a confirmed Chapter 11 case involving multiple parties. This is the concept of "equitable" mootness.

In re Milk Palace, 327 B.R. at 467 (footnote omitted).

As its name implies, equitable mootness involves consideration of a wide range of factors. The district court in this case adopted, with some modifications, the five-factor analysis employed by the court in In re Milk Palace, 327 B.R. 462. Those factors are:

20

(1) whether a stay has been obtained; (2) whether the plan has been substantially consummated; (3) whether the relief requested would affect the rights of parties not before the Court; (4) whether the relief requested would affect the success of the confirmed plan; and (5) the public policy of affording finality to bankruptcy court judgments.

Id. at 468 (footnotes omitted).

Other courts have focused on additional factors, such as whether "the 'parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings,'" Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 953 (2d Cir. 1993) ("Chateaugay II") (quoting Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Transp., Inc., 841 F.2d 92, 96 (4th Cir. 1988)), whether "such relief will not unravel intricate transactions so as to 'knock the props out from under the authorization for every transaction that has taken place' and 'create an unmanageable, uncontrollable situation for the Bankruptcy Court,'" id. (quoting In re Roberts Farms, 652 F.2d at 797), and whether granting relief would affect "the re-emergence of the debtor as a revitalized corporate entity," In re AOV, 792 F.2d at 1149.

Most courts seem to place the greatest focus on whether the confirmed plan that is being challenged has been substantially consummated and, if so, what effects reversal of the plan would likely have on third parties. See, e.g., Wooley v. Faulkner (In re SI Restructuring, Inc.), 542 F.3d 131, 135-36 (5th Cir. 2008) ("'The concept of [equitable] "mootness" from a prudential standpoint protects

21

the interest of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented.'  The ultimate question to be decided is whether the Court can grant relief without undermining the plan and, thereby, affecting third parties.") (quoting In re Manges, 29 F.3d at 1039) (footnote omitted); Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. HomePatient, Inc.), 420 F.3d 559, 564 (6th Cir. 2005) ("The last, and most important factor, is whether the relief requested would affect either the rights of parties not before the court or the success of the plan.").  Courts focus slightly less on the issue of whether the parties sought a stay pending appeal.  See In re Inv. Co. of the Sw., Inc., 341 B.R. 298, 308 (10th Cir. B.A.P. 2006) (noting that "failure to obtain a stay pending appeal cannot be determinative on the issue of equitable mootness, because it is the absence of a stay that generally has caused the change of circumstances[, so t]his factor would thus be present in all appeals not stayed").  The other factors are often given much less weight and, in some cases, completely ignored.  See, e.g., In re SI Restructuring, 542 F.3d at 135-36 (stating that equitable mootness "protects the interest of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented" and listing the following factors as determinative of the equitable mootness inquiry: "(i) whether a stay has been obtained, (ii) whether the plan has been 'substantially consummated,' and (iii) whether the relief requested would affect either the rights

22

of parties not before the court or the success of the plan") (quotations omitted).

It seems that under the doctrine of equitable mootness a court should decline to hear an appeal of a bankruptcy court's decision where the answers to the following six questions indicate that reaching the merits would be unfair or impracticable: (1) Has the appellant sought and/or obtained a stay pending appeal? (2) Has the appealed plan been substantially consummated? (3) Will the rights of innocent third parties be adversely affected by reversal of the confirmed plan? (4) Will the public-policy need for reliance on the confirmed bankruptcy plan—and the need for creditors generally to be able to rely on bankruptcy court decisions—be undermined by reversal of the plan? (5) If appellant's challenge were upheld, what would be the likely impact upon a successful reorganization of the debtor? And (6) based upon a quick look at the merits of appellant's challenge to the plan, is appellant's challenge legally meritorious or equitably compelling? These six factors are not necessarily conclusive, nor will each factor always merit equal weight. But these six factors seem to reflect the factors often weighed in other cases where equitable mootness is at issue.

As with constitutional mootness, we hold that the party seeking to prevent this court from reaching the merits of the appeal bears the burden of proving that, for pragmatic reasons, the court should abstain from reaching the merits of the case. We thus reject the conclusion that some courts have reached that a finding of substantial consummation will shift the burden to the party seeking to have the

23

court reach the merits of its challenge to the plan. See Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94 F.3d 772, 776 (2d Cir. 1996) ("Chateaugay III") ("Reviewing courts presume that it will be inequitable or impractical to grant relief after substantial consummation of a plan of reorganization."). Instead, we hold that the party inviting the court not to reach the merits of an appeal always carries the burden of showing that the answers to the six questions discussed above demonstrate that it would be unfair or impracticable to reverse the confirmed plan. None of the issues raised in those questions can, on their own, create a presumption against the court reaching the merits of the challenge. See In re AOV, 792 F.2d at 1148 ("In exercising its discretionary power to dismiss an appeal on [equitable] mootness grounds, a court cannot avoid its obligation to scrutinize each individual claim, testing the feasibility of granting the relief against its potential impact on the reorganization scheme as a whole. 'Substantial consummation' is not a blanket discharge of this judicial duty to examine carefully each request for relief.").

2. *Applying the Principles of Equitable Estoppel to this Case, we Reverse the District Court's Decision To Dismiss SMDI's Appeal*

a. *Failure to Obtain Stay*

"The first question in [an equitable] mootness inquiry is whether the [appellant] secured a stay to prevent execution of the reorganization plan." In re GWI, 230 F.3d at 800. This inquiry really involves two questions: (1) Did the

24

party seeking reversal try to obtain a stay? (2) Assuming the party seeking reversal sought a stay, was that party successful in obtaining a stay pending appeal?

Different courts have placed a greater emphasis on one or the other of these questions. Compare Chateaugay II, 10 F.3d at 953 (inquiring into whether "the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order") (quotation and alteration omitted; emphasis added), and Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 144 (2d Cir. 2005) ("A chief consideration . . . is whether the appellant sought a stay of confirmation.") (emphasis added), and Nordhoff Invs., 258 F.3d at 191 (Alito, J., concurring) (stating that he was reluctantly concurring "primarily" because of "the appellants' failure to seek a stay") (emphasis added), with In re Long Shot, 224 B.R. at 480-81 (stating that a party's failure to obtain a stay "is only tangential to the factors related to the substantial consummation of a plan and the affect on third parties, because '[a] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization.'") (quoting In re UNR Indus., 20 F.3d at 770), and In re Milk Palace, 327 B.R. at 468 (inquiring into whether appellant obtained a stay pending appeal).

We think both of these questions are significant. We will obviously be less inclined to apply the doctrine of equitable mootness when the appellant has

25

successfully obtained a stay, at least in part because that will also generally be dispositive of other relevant factors, such as whether the plan has been substantially consummated and whether reversal of the plan would negatively affect third parties. However, we will also examine an appellant's efforts to obtain a stay, even if those efforts were unsuccessful. On the one hand, an appellant's complete and unjustified failure to seek a stay will often make it unfair for the court to grant relief—especially if that relief may affect third parties. See In re Roberts Farms, 652 F.2d at 798 ("An entirely separate and independent ground for dismissal has also been established because Appellants have failed and neglected diligently to pursue their available remedies to obtain a stay of the objectionable orders of the Bankruptcy Court and have permitted such a comprehensive change of circumstances to occur as to render it inequitable for this court to consider the merits of the appeal."). On the other hand, we will be more inclined to accommodate an appellant who has diligently but unsuccessfully pursued a stay pending appeal, even if awarding him relief may adversely affect third parties. See In re Metromedia, 416 F.3d at 144 ("If a stay was sought, we will provide relief if it is at all feasible, that is, unless relief would 'knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court.'") (quoting Chateaugay II, 10 F.3d at 953). Thus, we will not only look to whether a stay has been obtained; we will also inquire into whether the appellant has sought

26

a stay pending appeal.

This case presents a sort of middle ground. SMDI sought a stay from the bankruptcy court and the district court, but did not appeal the denial of those requests to this court. Nor did SMDI seek mandamus relief directly from this court. Thus, while SMDI made some effort to obtain a stay, it did not pursue "with diligence all available remedies to obtain a stay of execution." Chateaugay II, 10 F.3d at 953 (quotation omitted; emphasis added); see also In re Pub. Serv. Co., 963 F.2d at 472 (holding that appeal was equitably moot where appellant had sought a stay from the bankruptcy and district courts, but did not seek either appellate or mandamus relief from the circuit court). Where a party has sought a stay from both the bankruptcy and district courts, the party's failure to appeal that decision to this court, which so rarely overturns the district courts' decisions, will not, without more, render an appeal of the merits moot. But cf. In re Metromedia, 416 F.3d at 144 (stating that "[w]e insist that a party seek a stay even if it may seem highly unlikely that the bankruptcy court will issue one"). Thus, this factor weighs somewhat against proceeding to the merits of SMDI's appeal, but is not dispositive.

b. *Substantial Consummation*

The second consideration in the mootness inquiry is whether the reorganization plan has been substantially consummated. We have adopted the "'substantial consummation' yardstick because it informs our judgment as to when finality concerns and the reliance interests of third parties upon the plan as effectuated have become paramount to a

27

resolution of the dispute between the parties on appeal."

In re GWI, 230 F.3d at 801 (quoting In re Manges, 29 F.3d at 1041). The

Bankruptcy Code defines "substantial consummation" of a reorganization plan as:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
>
> (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). That "standard has been adopted in the equitable mootness

analysis to determine the extent to which the plan has progressed." In re United

Producers, 526 F.3d at 948.

The district court found here that the Joint Plan affirmed by the bankruptcy

court had been substantially consummated because "post-confirmation all estate

property intended to be transferred has been transferred, the Liquidating Trustee

and/or Plan Trustee as successor to the trustee has assumed management of the

property dealt with under the confirmed plan, and Plan Trustee has made

substantial distributions under the plan." (Dist. Ct. Order at 12.) Since the

district court made that finding, the trustee has paid out even more claims,

incurred more administrative costs, and continued to prosecute the AP. Perhaps

in light of those additional efforts, on appeal, SMDI concedes that the Plan has

been substantially consummated, and argues instead that the other factors support

28

a finding in their favor.  (See Aplt. Br. at 25.)

We see no reason to reject SMDI's concession of substantial consummation, but note that this concession is not dispositive of our analysis of whether the doctrine of equitable mootness should prevent the court from reaching the merits of SMDI's appeal.  See Ins. Subrogation Claimants v. U.S. Brass Corp. (In re U.S. Brass Corp.), 169 F.3d 957, 961 (5th Cir. 1999) ("Substantial consummation of a reorganization plan is a momentous event, but it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief.  Rather, we must also consider whether the remedy the [appellants] seek will affect the success of the plan or alter the rights of third parties that have been achieved by its substantial consummation.") (citations and quotations omitted); Chateaugay II, 10 F.3d at 952 ("Substantial consummation of a reorganization plan is a momentous event, but it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief."); In re AOV, 792 F.2d at 1148 ("In exercising its discretionary power to dismiss an appeal on [equitable] mootness grounds, a court cannot avoid its obligation to scrutinize each individual claim, testing the feasibility of granting the relief against its potential impact on the reorganization scheme as a whole.  'Substantial consummation' is not a blanket discharge of this judicial duty to examine carefully each request for relief.").  The substantial consummation of a bankruptcy plan may make providing relief difficult, and may raise concerns

29

about fairness to third parties, but "[c]ourts can and do order divestiture or damages in" situations where business deals or bankruptcy plans have been wrongly consummated. In re Res. Tech. Corp., 430 F.3d 884, 886-87 (7th Cir. 2005).

In this case, although this plan has been substantially consummated, many of the concerns that motivate courts not to decide the merits of an appeal of a substantially consummated bankruptcy plan do not apply. For example, courts are often concerned that it will be difficult to unscramble the transactions that occurred when consummating the plan. In this case, however, reversal of the Joint Plan will not undo any complex transactions. SMDI primarily seeks to undo the sale of the domain name to ConsumerInfo, which is not likely to be particularly complex or troublesome. See Nordhoff Invs., 258 F.3d at 185-86 (discussing the complexity of the post-confirmation transactions and whether unscrambling those transactions would be difficult enough to counsel against reaching the merits of the appellants' appeal). SMDI also proposes transferring control of the estate from the liquidating trust back to the Chapter 11 trustee. This also does not appear to pose a very serious problem, because the bankruptcy trustee and liquidating trustee is the same person. This case is not, therefore, like the Tenth Circuit BAP decision in In re Milk Palace Dairy, 327 B.R. at 467, where the court "question[ed] whether it could order the bankruptcy court to retrieve the assets from the Trust when the Trust has not presented its position to

30

either the trial court or this Court." In this case, there appears to be no equitable or technical barrier to this court's ability to order the dissolution of the Liquidating Trust. Further, even if the court cannot transfer the Liquidating Trust's assets back to the estate, it could presumably find a way to use the Liquidating Trust's assets to SMDI's benefit. Thus, at least some of the reasons courts are reluctant to undo substantially consummated bankruptcy plans do not pose serious problems in this case. In addition, the party most likely to be injured by an undoing of the Joint Plan is ConsumerInfo, which is hardly an innocent third party unaware of SMDI's continuing objection to the consummation of the Joint Plan. ConsumerInfo has been, and is, SMDI's main antagonist and it is intimately involved in the entire convoluted history of this bankruptcy proceeding.

Finally, where, as here, the parties attempting to convince the court not to reach the merits have accelerated the consummation of the plan despite their knowledge of a pending appeal—in this case, by waiving the requirement that the consummation await the resolution of all pending appeals—we are less inclined to grant their wish that the court abstain from reaching the merits on appeal. We must, therefore, carefully examine the remaining factors.

### c. *Effects on Third Parties*

The effects that reversal will have on non-party creditors is probably the foremost concern in our analysis of equitable mootness. See, e.g., In re SI

31

Restructuring, 542 F.3d at 136 ("The ultimate question to be decided is whether the Court can grant relief without undermining the plan and, thereby, affecting third parties."). This factor may even implicate the court's jurisdiction, since a court may lack jurisdiction over an appeal where the impact of reversal would fall most heavily on parties not before the court. See In re Pub. Serv. Co., 963 F.2d at 475-76 & 476 n.19 (collecting cases and noting that this jurisdictional idea is "closely analogous to appeals determined moot due to loss of jurisdiction over the *res*, or the parties, occasioned by their removal or transfer from the jurisdiction in the absence of a stay or injunctive relief pending appeal"). The district court found that reversing the bankruptcy court's decision would unduly harm third parties because "there is no evidence at this point that there is sufficient money in place to immediately and fully cover all amounts paid under the confirmed plan." (Dist. Ct. Order at 14.)

The district court wrongly placed the burden of proof on this issue on SMDI. The district court did not conclude that Appellees had shown that SMDI had insufficient funds to finance their plan and, therefore, that third parties would be adversely affected. Rather, the district court concluded that SMDI had failed to prove that it had sufficient funds. The proper focus should have been on the former question.

Focusing our attention on that former question, we find that Appellees have failed to carry their burden to prove that the relief SMDI seeks would unduly

32

affect third parties. In the first place, as noted above, because of ConsumerInfo's pivotal role in the bankruptcy proceedings, it is hard to consider it a "third party" or at least an innocent third party. In any event, we do not have sufficient evidence of SMDI's finances, the value of the domain name SMDI would obtain if they prevailed, or the cost of implementing SMDI's plan. However, the little evidence we do have strongly suggests that SMDI would be more than able to finance their plan. Therefore, this factor weighs substantially against applying the doctrine of equitable mootness in this appeal.

### i. The Cost of Confirming SMDI's Plan

Appellees argue that SMDI lacks adequate funds to cover the estate's expenses and, therefore, that reversal of the Joint Plan and confirmation of SMDI's plan would require disgorgement of payments already made to third-party creditors. Specifically, Appellees argue that SMDI lacks the funds necessary to cover the following expenses that they would incur if their plan was confirmed:[9] (1) more than $2.84 million to repay funds that have been paid or loaned to the estate by ConsumerInfo; (2) $2.2 million to pay out the CCB Data claims purchased by ConsumerInfo that were voluntarily subordinated under the Joint Plan; (3) $2.68 million that has been paid out to creditors, $1.45 million of which has been paid to "innocent third party creditors and taxing authorities" (Aple. Br.

---

[9] Obviously, some of these expenses are duplicative. For example, the funds paid out by the estate are largely duplicative of the funds either paid or loaned to the estate by ConsumerInfo.

at 29); and (4) the cost of objecting to the CCB Data claims and of defending the estate against a breach-of-contract claim that would be filed if SMDI's plan were confirmed. We briefly consider each of those expenses.

Appellees have failed to show that SMDI would be liable to refund the $2.84 million that ConsumerInfo has paid or loaned the estate. Appellees have not explained, for example, which, if any, of those funds were paid to the estate in order to prosecute the AP, the costs of which may not have to be repaid by SMDI. Further, some of this money likely represents payments made to the trustee and, if SMDI prevails on its argument that the trustee has not been "disinterested," the bankruptcy court may order disgorgement of payments made to compensate the trustee. See Gray v. English, 30 F.3d 1319, 1324 (10th Cir. 1994) (affirming bankruptcy court's decision to deny compensation to bankruptcy trustee who was not "disinterested" and noting that "[i]n exercising the discretion granted by the statute we think the court should lean strongly toward denial of fees, and if the past benefit to the wrongdoer fiduciary can be quantified, to require disgorgement of compensation previously paid that fiduciary even before the conflict arose"); see also Salomon v. Logan (In re. Int'l Envtl. Dynamics, Inc.), 718 F.2d 322, 326 (9th Cir. 1983) (holding that appeal of bankruptcy court decision was not moot in part because the estate's counsel was "a party to [the] appeal" and "this court could fashion effective relief by remanding with instructions to the bankruptcy court to order" the estate's counsel to return "erroneously disbursed funds").

Thus, it is far from clear that SMDI would be liable for this full amount.[10]

Appellees further argue that SMDI's plan fails to account for the CCB Data claims against the estate that have been purchased by ConsumerInfo. However, while these claims seek $2.1 million, the bankruptcy court estimated those claims at $225,000. That estimation was "only for the purpose of considering confirmation of the Competing Plans," but still provides at least some indication that those claims are actually worth far less than their face value. Thus, even if SMDI will need to pay those claims, they may not present a very substantial burden.

Appellees argue that SMDI would be liable for $2.68 million that has been paid out to creditors. However, Appellees concede that only $1.45 million has been paid to "innocent third party creditors and taxing authorities" (Aple. Br. at 29), and for purposes of our analysis of likely third-party effects, we are primarily concerned with those payments.

Finally, Appellees argue that SMDI's plan failed to account for the cost of objecting to the CCB Data claims purchased by ConsumerInfo or of defending the

---

[10] Although the parties do not focus much on this issue, it is possible that, if SMDI prevailed on appeal, they would need to provide $1.825 million to the estate immediately. This amount may be needed because the APA provides that, in the event that the Trustee settles the Adversary Proceeding, as is proposed in the SMDI plan, the Trustee must immediately refund $1,825,000 to ConsumerInfo. Thus, this amount—which is far less than what ConsumerInfo would seek to be paid if SMDI's plan is approved—may be SMDI's responsibility to pay.

estate against the lawsuit ConsumerInfo is likely to file for breach of the APA if SMDI's plan is confirmed. We agree that the $20,000 that SMDI proposed to supply for the trustee's expenses would not likely be sufficient to cover these expenses. However, Appellees have not shown that these expenses are likely to pose a very heavy financial burden.

Initially, we note that, as mentioned above, the CCB Data claims appear to be worth far less than their facial amount, and it seems likely that settling those claims would not pose a debilitating financial burden. Further, unlike the bankruptcy court, which denied confirmation of SMDI's plan in part because it found that by compelling the trustee to settle the AP, SMDI's plan "could easily be construed as a breach of Trustee's duties" to ConsumerInfo under the APA, In re Paige, 2007 WL 4143212, at *16, and would open the estate to a potentially serious breach-of-contract claim, we are not convinced that Appellees would necessarily have a viable breach-of-contract claim if SMDI's plan was ultimately confirmed. The APA empowered ConsumerInfo to "object [to] or to overbid" any settlement agreements (see Appx. at 317-18); there does not appear to be anything in the APA that gives ConsumerInfo the power to veto a settlement. Further, where the court orders a settlement, as is proposed by SMDI's plan, it appears that ConsumerInfo's ability to "overbid" may be meaningless. We are unsure, therefore, that SMDI's plan would necessarily run afoul of the APA. Further, at a hearing seeking the bankruptcy court's approval for the APA, the trustee's

36

counsel asserted that the trustee would "retain control over" the AP. If it is true that, under the APA, the trustee is "in control" of the AP, it is perplexing that he could also be in breach of the APA by agreeing to settle the AP. On the other hand, if settling the AP would constitute a breach of the APA, then the trustee's counsel may have misled the bankruptcy court when he stated the trustee would retain control over the AP, and it might be inequitable to allow the trustee to use his now-asserted lack of control over the AP as a reason to prevent the courts from reaching the merits of SMDI's appeal. Therefore, even if SMDI's claims on appeal present a financial burden on the estate, the hypothetical costs do not weigh very heavily in favor of equitable mootness.

*ii. SMDI's Resources*

When this case was before the bankruptcy court, SMDI had placed $2.6 million in a special account in order to demonstrate their ability to fund their plan. See In re Paige, WL 4143212 at *6. When this case came before the district court on appeal, however, it appears that money was no longer in the account. Nonetheless, the fact that this money was no longer set aside in an account for these purposes does not mean that SMDI would be unable to replace that money. On the contrary, without any evidence to the contrary, the fact that just a few years ago SMDI was able to put $2.6 million in an account suggests that they have substantial funds at their disposal.

More importantly, if SMDI's plan is confirmed, SMDI will obtain full

ownership of a very valuable domain name: FreeCreditScore.com. Mr. Balducci, a ConsumerInfo executive, testified that ConsumerInfo would be willing to pay $5 million for the FreeCreditScore.com domain name. Mr. May, the CEO of Search Market, testified before the bankruptcy court that the domain name is worth $25 million. Mr. May's estimate may be high, but the evidence before the court supports Mr. Balducci's $5 million estimate, if for no other reason than, if SMDI prevails, they would likely be able to sell the domain name to ConsumerInfo for that amount.[11] Thus, SMDI should have approximately $7 million at their disposal if their plan were confirmed.[12]

---

[11] Alternately, SMDI could probably use the domain name as collateral on a $5 million loan.

[12] When analyzing whether we should reach the merits of SMDI's appeal, we do not confine our analysis to whether SMDI's plan provided sufficient funds to cover all of the estate's expenses. If the district court could reverse the Joint Plan and give SMDI the opportunity to amend their plan to cover any expenses not covered in SMDI's original plan—amendments that we think SMDI may be willing to make in light of how highly they value the domain name—then it should reach the merits of SMDI's appeal. See Chateaugay II, 10 F.3d at 954 ("Certainly, [the appellants] would readily accept some fractional recovery that does not impair feasibility or affect parties not before this Court, rather than suffer the mootness of [their] appeal as a whole."). Therefore, for purposes of determining whether to reach the merits of this appeal, we will not confine ourselves to the funds that SMDI proposed to provide in their original plan.

Further, SMDI's plan, like ConsumerInfo's plan, provided that SMDI would cover expenses not included in its original estimate. Therefore, even if the only effective relief the court could offer would involve confirmation of SMDI's plan, the fact that their originally proposed $2.6 million may not cover all of the estate's expenses would not necessarily be fatal to our ability to reach the merits of this appeal.

38

### iii. The Bottom Line

Appellees have failed to show that SMDI would be unable to finance their plan. On the contrary, the evidence suggests that SMDI's resources may exceed a reasonable estimation of the costs of implementing their plan. Further, even if SMDI's plan cannot be confirmed without additional funding, the court could still reverse the Joint Plan without adversely affecting third parties, and "[c]ertainly, [SMDI] would readily accept some fractional recovery that does not impair feasibility or affect parties not before this Court, rather than suffer the mootness of [their] appeal as a whole." Chateaugay II, 10 F.3d at 954. Thus, this factor weighs in favor of reaching the merits of SMDI's appeal.

### d. Public Policy and Finality

This factor "reflects a court's concern for striking the proper balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy court order adversely affecting him." First Union Real Estate Equity & Mortgage Inv. v. Club Assocs. (In re Club Assocs.), 956 F.2d 1065, 1069 (11th Cir. 1992); see also In re Long Shot, 224 B.R. at 479 ("In bankruptcy cases, [equitable mootness] 'centers on the important public policy favoring orderly reorganization and settlement of debtor estates by affording finality to the judgments of the bankruptcy court.'") (quoting In re Pub. Serv. Co., 963 F.2d at 471-72) (further quotation omitted). As the Second Circuit explained,

39

"[a]s a practical matter, completed acts in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification if a plan of reorganization is to succeed." In re Chateaugay, 988 F.2d at 326.

Further, it is equally important that a court not reverse a bankruptcy plan if "an appellate reversal of the substantially consummated reorganization plan . . . would 'creat[e] a nightmarish situation for the bankruptcy court on remand' and make reconstructive relief extremely improbable." In re Pub. Serv. Co., 963 F.2d at 474 (quoting Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.), 92 B.R. 38, 50 (S.D.N.Y. 1988)) (citations, alteration omitted).

The district court found that "[t]his factor weighs heavily in favor of mootness." (Dist. Ct. Order at 15.) The district court was concerned that SMDI's appeal was really designed to undo the APA between the estate and ConsumerInfo, and that allowing SMDI to conduct this roundabout attack on the APA "would entirely undermine the finality of Bankruptcy Court orders approving the sale of property." (Id. at 16.)

Although the district court was correct to note that reversal would impact the finality of the bankruptcy court's orders, there are countervailing concerns that outweigh the public policy interest in finality of bankruptcy court decisions in this case. SMDI's appeal raises troubling allegations of bad-faith dealings between the debtor, ConsumerInfo, and the trustee, and of a lack of disinterestedness on the part of the trustee. While this court expresses no opinion

40

on the substantive merits of those allegations, these are serious allegations that should, if possible, receive their due attention.

Further, Appellees have failed to present any reason for this court to suspect that reversal of the Joint Plan would create an unmanageable situation for the bankruptcy court. On the contrary, it is clear that both SMDI and ConsumerInfo are willing to pay far more than the aggregate amount of all the estate's debts and expenses in order to acquire the domain name. There is, therefore, very little risk that the court would need to unwind any of the payments that have been made to innocent third-party creditors. Similarly, Appellees have failed to point to any other aspects of the Joint Plan that would be difficult to undo if SMDI prevails on the merits of their appeal.

This factor therefore weighs in favor of reaching the merits of SMDI's appeal.

e. *Impact upon the Likelihood of a New Reorganization*

Here, the analysis already undertaken in our opinion suggests there is a substantial likelihood of a new successful reorganization of the debtor even if SMDI were partially or wholly to succeed in their appeal in this case. See In re United Producers, 526 F.3d at 950 (considering, among other factors, "what the consequences of reversal of the confirmed plan would be for the success of the reorganization"); see also In re Manges, 29 F.3d at 1039 (considering, in applying equitable mootness, "'whether it is prudent to upset the plan of reorganization at

this late date'") (quoting <u>In re UNR Indus.</u>, 20 F.3d at 769). Thus, in this case, this factor cuts against applying equitable mootness.

         f. *A Quick Look at the Merits*

Although at this stage of the proceedings neither we nor the district court has thoroughly or even adequately evaluated the merits of SMDI's claims, a quick look at this appeal suggests the claims may have some merit. <u>See</u> <u>In re Metromedia</u>, 416 F.3d at 144 ("Because equitable mootness bears only upon the proper remedy, and does not raise a threshold question of our power to rule, a court is not inhibited from considering the merits before considering equitable mootness. Often, an appraisal of the merits is essential to the framing of an equitable remedy.") (citation omitted). SMDI's claims certainly allege serious conflicts of interest involving the trustee, and questions about whether SMDI's competing proposal has received an adequate and balanced appraisal. These are serious matters that will not lightly be swept under the rug in the name of equitable mootness unless other factors discussed above strongly counsel against allowing SMDI's claims to be heard on the merits. In many ways, the claims raised go to the very integrity of the bankruptcy process in this case.

Given the lack of clear direction from the other factors discussed above, this final factor counsels against equitable mootness.

      4. *Conclusion*

These six factors certainly do not all point in one way or the other. On the

one hand, SMDI did not diligently pursue all available options to seek a stay and, as a result, the Joint Plan has been substantially consummated. On the other hand, Appellees have failed to show that reversal would unduly affect innocent third parties, and the public policy factors in this case strongly lean towards reaching the merits on appeal. Appellees have the burden of proof on this issue, and they have failed to convince us that the courts should avoid reaching the merits of this appeal.

## III. Conclusion

For the foregoing reasons, we REVERSE the district court's dismissal of SMDI's appeal, and REMAND to the district court with instructions to address the merits of SMDI's appeal in a manner consistent with this opinion.